*760
 
 OPINION
 

 Per Curiam:
 

 This difficult case invokes an examination of the law pertaining to a blood bank’s liability to a transfusion recipient who developed the AIDS virus after receiving blood from an infected donor. For the reasons discussed below, we conclude that the activities of blood banks at issue herein are subject to a professional standard of care, and that appellant failed to show at trial that the procedures adopted and followed by respondent United Blood Services fell below this standard. Accordingly, we reverse and remand for entry of judgment in favor of United Blood Services.
 

 FACTS
 

 On June 5, 1984, twenty-four-year-old Jeffrey Clark accidentally shot himself with a double-barreled shotgun, inflicting a massive wound to his lower abdomen. Clark was taken to the emergency room of a small hospital in Bishop, California, where he underwent extensive surgery and received voluminous transfusions of blood and blood products. Without these blood transfusions, Clark would have died. Most of the blood given to Clark was supplied by respondent United Blood Services (“UBS”), a federally-licensed, non-profit blood bank.
 

 One of the units supplied by UBS and transfused to Clark came from a donor (“John Donor”) who gave blood to UBS on May 4, 1984. This unit, in the form of fresh frozen plasma, was adminis
 
 *761
 
 tered to Clark on June 7, 1984. John Donor’s blood subsequently tested positive for the human immunodeficiency virus (“HIV”) when he returned to UBS to donate blood in May of 1985.
 
 [1]
 

 In December of 1986, Clark learned of the possibility that he had received blood from an HIV-infected donor and was tested. On December 22, 1986, Clark was notified that his blood tested positive for the HIV antibody. Clark was first diagnosed with an opportunistic disease, indicative of AIDS, in September, 1988, and by April of the following year, the disease had forced Clark to cease working permanently.
 

 On December 9, 1988, Clark filed an action against UBS for damages allegedly caused by the latter’s negligence in screening donors and testing blood, thereby failing to prevent the transfusion of blood contaminated by the deadly virus. After UBS answered the complaint and unsuccessfully sought summary relief based upon the statute of limitations, the matter proceeded to trial. The jury awarded Clark $970,000 in damages, $600,000 of which represented loss of future earnings.
 

 UBS moved for judgment notwithstanding the verdict and a new trial, or, in the alternative, for remittitur damnum and to alter or amend the judgment. The trial court denied the motion for JNOV, but granted remittitur, finding that the jury had disregarded jury instruction 21 regarding future lost earnings and had awarded excessive damages out of passion or prejudice. Specifically, the $600,000 award for future lost earnings was reduced to $83,045; a $50,000 award for past medical expenses was decreased to $22,497.42; and a $45,000 award for past lost earnings was reduced to $29,890. The court also ordered a new trial on all issues in the event Clark refused to accept the remitti-tur. In a separate order, the court limited the amount of expert witness fees recoverable by Clark to $3,000 for each of his two expert witnesses. Clark rejected the remittitur and a new trial was ordered.
 

 Clark appealed the district court’s order for remittitur or a new trial and the order limiting expert witness fees. UBS cross-appealed the court’s denial of its motion for a directed verdict. Amicus curiae briefs in support of UBS’ position were filed by the American Red Cross and the American Association of Blood Banks (“AABB”), jointly, and by the College of American Pathologists.
 
 [2]
 
 Jeffrey Clark died on July 30, 1991, after the
 
 *762
 
 opening briefs on appeal were filed. Clark’s mother, Becky Brown, has pursued this appeal as Clark’s personal representative. For purposes of uniformity, the appellant will be referred to throughout this opinion as Clark.
 

 DISCUSSION
 

 The following information, drawn from various sources, is provided as a background for understanding the progression of medical knowledge of AIDS and its transmission through blood transfusions and the adequacy of the measures taken by UBS to protect its blood supply.
 

 Acquired Immune Deficiency Syndrome (“AIDS”) is a viral disease in which the afflicted person suffers a loss of natural immunity against disease. Victims thus become vulnerable to opportunistic diseases that persons with healthy immune systems can resist or easily overcome. The disease identified generally as AIDS advances in three progressively debilitating stages. Initially, a victim will be a symptomless but infectious carrier known as a “seropositive.” A person may remain in this stage for many years without showing any manifestations of the sickness. The next stage of the disease is called AIDS-Related Complex (“ARC”). Here, the infected person suffers from pre-AIDS symptoms, such as enlarged lymph nodes, involitional weight loss, fever, chronic diarrhea and immunological abnormalities. The final stage is full-blown AIDS, in which opportunistic diseases attack the body, ultimately resulting in death. It is generally accepted that all ARC patients will develop full-blown AIDS. Presently, the mortality rate of people with AIDS is one hundred percent.
 

 The currently recognized methods of transmitting AIDS are: intimate sexual contact, sharing contaminated needles, transfusing contaminated blood products, and transmissions from an infected mother to her newborn child. However, ten or more years ago, far less was known about the disease.
 

 Cases of AIDS were first diagnosed and reported in mid-1981. Initial theories about AIDS centered around sexual transmission of the disease, as the early victims shared the common trait of being sexually-active homosexual men. In July of 1982, opportunistic diseases were first diagnosed in hemophiliacs, raising the possibility that AIDS might be blood-borne. In December of 1982, the Center for Disease Control (“CDC”) reported a case of “possible transfusion-associated AIDS,” involving an infant who contracted the disease after receiving blood platelets. Blood donor screening guidelines were discussed and recommended in January of 1983 by the government and the blood bank industry.
 

 On April 23, 1984, the United States Public Health Service
 
 *763
 
 announced that researchers had identified the causative agent of AIDS, then labelled HTLV-III, and now known as the human immunodeficiency virus. In March 1985, a test for detecting blood infected with the AIDS virus first became available; the test ,was referred to as the Enzyme-linked Immunosorbent Assay (“ELISA”) test. The ELISA test does not detect the AIDS virus directly, but rather detects the presence of a natural protein created by the body’s immune system to attack the virus. When the ELISA test is coupled with a second test, the Western Blot Analysis, the rate of detection for exposure to AIDS is greater than ninety-nine percent. The small number of undetected cases are attributed to: (1) false negatives resulting from uncommon strains of the virus; (2) the fact that it may take up to six months after exposure to the AIDS virus for the body to produce the antibodies which the test will detect; and (3) the absence of the antibodies in victims in the late stages of AIDS.
 

 A primary issue involved in this case concerns surrogate testing for AIDS, an idea suggested by some that antedated the ELISA test. A surrogate test is used to detect a disease which is commonly associated with the target disease. The most commonly discussed surrogate test was one for the hepatitis B antibody, which is present in a large percentage of AIDS patients. Most blood banks used a procedure known as the surface antigen test to detect hepatitis before AIDS became a concern. A second test for hepatitis, called the core antibody test, became available around 1982, but was rarely used. Some advocated the use of the core antibody test as a more accurate method of detecting whether a person had had hepatitis, and hence a more useful surrogate test.
 

 Before the ELISA test became available, the method for safeguarding the blood supply, promulgated by the government and the blood bank industry, was to advise donors of the danger of transmitting AIDS and ask them to voluntarily refrain from giving blood if they were in a high risk category or had any symptoms of AIDS. UBS’s practice was to give each donor a flyer labelled “Important Notice” which identified groups at high risk for AIDS and asked donors who were in one of the high risk groups not to give blood.
 
 [3]
 
 The notice also told donors that any deferment of their donation of blood would remain confidential, and that no explanation was necessary if a donor chose not to give blood. A donor could simply answer “no” to the question asking if the donor was in good health, or if the donor felt compelled to give blood, he or she could call the blood bank within four hours and confidentially request that the blood not be used.
 

 
 *764
 
 John Donor remembered receiving an “Important Notice” flyer when he donated blood in May, 1984. Nothing in John Donor’s deposition indicates that he was a member of a high-risk group identified in the “Important Notice,” or that he had reason to believe he was an AIDS carrier. John Donor speculated that he must have contracted AIDS from blood transfusions he received in 1979 and 1980.
 

 Standard of Care
 

 We first address UBS’s argument on cross appeal that it was entitled to judgment as a matter of law, as an affirmative ruling on this issue would be dispositive of Clark’s appeal. UBS asserts that the trial court should have directed a verdict in its favor because the evidence presented at trial did not support a finding of negligence.
 

 Of primary importance to our review of the district court’s ruling is a determination of the standard of care applicable to a negligence action against a supplier of blood. UBS contends that its actions should have been evaluated according to a professional standard of care defined by the prevailing customs and practices of reasonably competent blood banks in similar circumstances, as established by expert testimony.
 
 See
 
 Wickliffe v. Sunrise Hosp., Inc., 104 Nev. 777, 783, 766 P.2d 1322, 1326 (1988). Clark contends that UBS was properly held to an ordinary negligence standard, which permitted the jury to determine how a reasonably prudent blood bank
 
 should
 
 have performed under the circumstances, and compare UBS’s procedures against that standard.
 

 Before the advent of AIDS, courts used the professional standard of care to examine blood banks’ liability for failing to prevent the spread of other diseases through blood transfusions.
 
 See, e.g.,
 
 Hines v. St. Joseph’s Hosp., 527 P.2d 1075, 1078 (N.M. Ct.App. 1974),
 
 cert, denied,
 
 529 P.2d 1232 (N.M. 1974) (compliance with government and industry standards established that blood bank acted with due care); Hutchins v. Blood Services of Montana, 506 P.2d 449 (Mont. 1973) (standard of care not established by one doctor’s testimony regarding preference for the use of a surrogate blood test for hepatitis).
 

 Courts have continued to apply the professional standard of care to the more recent cases involving recipients of AIDS-infected blood. Doe v. American Red Cross Blood Services, 377 S.E.2d 323 (S.C. 1989), a transfusion-associated AIDS case, held that blood banks were to be judged by “the generally recognized and accepted practices of the profession,” thereby deferring to the collective wisdom of the profession.
 
 Id.
 
 at 326.
 

 In Shelby v. St. Luke’s Episcopal Hosp., 1988 W.L. 28996, 56 U.S.L.W. 2680 (S.D.Tex. 1988), the court granted summary
 
 *765
 
 judgment for a blood center on several theories, including the allegation that the center was negligent in the screening of donors for AIDS in July of 1984. The
 
 Shelby
 
 court concluded that the center was entitled to summary judgment because it had “followed all applicable standards and procedures recommended at the time the blood in question was transfused.”
 

 Since the oral argument of this case, California has had occasion to decide the issue of the standard of care applicable to a blood bank. In Osborn v. Irwin Memorial Blood Bank, 7 Cal.Rptr.2d 101,
 
 review denied
 
 (Ct.App. 1992), the California court determined that the actions of the defendant blood bank were properly judged under a professional standard of care. Under this standard, the plaintiff’s experts’ opinions as to what they thought the blood bank should have been doing to protect the blood supply were irrelevant. A judgment notwithstanding the verdict was granted to the blood bank on the issue of its negligence in failing to take additional measures to screen donors and conduct surrogate tests for the AIDS virus.
 
 Id.
 
 at 105. The
 
 Osborn
 
 decision was later reaffirmed in Wilson v. Irwin Memorial Blood Bank, 18 Cal.Rptr.2d 517 (Ct.App. 1993), as the court again refused to hold the blood bank liable for not utilizing specified tests (including the core antibody test) that were, with rare exception, not used in the blood banking industry or endorsed by any professional or regulatory organization at the time of the contaminated transfusion.
 
 See also
 
 Smith v. Paslode Corp., 799 F.Supp. 960, 969 (E.D.Mo. 1992) (in HIV case, blood bank held to standard of care requiring it to “exercise the care commonly exercised by the ordinarily skillful, careful and prudent blood bank in its procurement, processing, distribution and use of blood products under the same or similar conditions”); Gibson v. Methodist Hosp., 822 S.W.2d 95 (Tex.Ct.App. 1991) (cited numerous cases supporting proposition that surrogate testing prior to 1985 was not the standard for the blood banking industry).
 

 The primary case relied upon by Clark to support the application of an ordinary negligence standard is Quintana v. United Blood Services, 811 P.2d 424 (Colo.Ct.App. 1991). The
 
 Quin-tana
 
 court, while acknowledging contrary authority, reasoned that blood banking was not a profession. On review, however, the Supreme Court of Colorado held that the Court of Appeals “erred by concluding that UBS’s conduct should be measured against the general nonprofessional standard of reasonable care rather than the national professional standard of care applicable to the blood banking community of which UBS was a member.” United Blood Services v. Quintana, 827 P.2d 509, 524 (Colo.
 
 *766
 
 1992).
 
 [4]
 
 Consequently, the application of a standard of ordinary care to the professional activities of blood banks finds little support in the case law.
 

 We join the clear and growing consensus of jurisdictions that view the production and safeguarding of the nation’s blood supply as a professional activity, entitled to a professional standard of care. We are convinced that determinations concerning the testing of donated blood and the exclusion of categories of donors are better suited to professionally-trained members of the industry rather than lay persons. Such determinations require professional expertise in adopting procedures necessary ifor securing healthy blood and blood products without dangerously impacting the availability of adequate blood supplies. We conclude, therefore, that UBS could have been held liable in the instant case only by proof that the measures which UBS took to screen donors and eliminate contaminated blood fell below the standards promulgated and practiced by the industry or by proof that the industry standards were unacceptably deficient given the extent of reliable data available to the industry at the time of the contaminated transfusion.
 
 [5]
 

 Conformity to Standard of Care
 

 Despite all that remains unknown about AIDS, today’s knowledge of the devastating disease far exceeds that existing at the
 
 *767
 
 time Jeffrey Clark received the infected transfusion. Hindsight may suggest that more steps should have been taken earlier to minimize the spread of the disease through blood transfusions. However, in carefully evaluating the trial evidence under a professional standard of care, we conclude as a matter of law that the procedures which UBS employed to protect its blood supply at the time of Clark’s transfusion essentially conformed to the industry-wide standard. We have reached this conclusion advisedly. A case is properly taken from the jury only when there is no role for the jury, as factfinder, to perform.
 
 See
 
 Gordon v. Hurtado, 91 Nev. 641, 541 P.2d 533 (1975). In the instant case, as stated above, there was no role for the trier of fact, as UBS was entitled to judgment as a matter of law.
 

 Clark’s theory of liability rests upon UBS’s alleged failure to implement three procedures which might have led to the rejection of John Donor’s May 10, 1984 blood donation. However, the evidence presented at trial failed to establish that any of these three procedures were utilized by the blood banking industry in May of 1984.
 

 A. Questioning Donors About History of Syphilis
 

 Clark asserts that UBS negligently failed to question donors about a history of venereal disease, and further, that UBS should have excluded all male donors with a history of syphilis (whether cured or not) because a high correlation exists between homosexual males (a group highly at-risk for the AIDS virus) and males with syphilis. Clark speculated that if UBS had questioned John Donor more thoroughly, it would have learned of his prior syphilis infection and rejected him as a donor.
 

 Detecting donors with a history of syphilis was not a major concern of blood banks in 1984 for two reasons. First, all blood was routinely tested for syphilis. Second, modern methods of storing blood eliminated much of the danger of transmitting syphilis by tranfusion. The syphilis bacteria is destroyed after 24 to 48 hours of refrigeration. Consequently, the AABB eliminated its requirement for syphilis testing in 1978, although the FDA maintained its requirement that every unit of blood be tested for syphilis.
 

 The record established that UBS tested John Donor’s blood for syphilis each time he donated, and that one unit of his blood, collected on November 5, 1982, was destroyed for testing positive. John Donor stated in his deposition that he had been treated and cured of syphilis. The unit of John Donor’s blood collected on May 10, 1984, and transfused to Clark tested negative for syphilis.
 

 
 *768
 
 Clark nevertheless attempted to show through the testimony of two experts that UBS was negligent in not delving further into John Donor’s medical history. Dr. Marcus Conant, a San Francisco dermatologist who specializes in treating AIDS patients, was allowed to testify as an expert on sexually transmitted diseases. Conant testified that syphilis is a “surrogate marker” for AIDS because the same kind of activity that puts people at risk for syphilis also puts them at risk for AIDS. Conant opined that he would have suspected that John Donor was homosexual based upon his prior syphilis infection, and that, as a suspected homosexual, he should not have been permitted to donate.
 

 Dr. David de Jongh, a retired blood banker and former director of the Charity Hospital Blood Bank in New Orleans, also testified for Clark. Dr. de Jongh stated that he would not have taken Clark’s blood because of his prior syphilis infection. Dr. de Jongh admitted, however, that the purpose of syphilis screening was to detect syphilis, not to screen for AIDS.
 

 The testimony of the two experts failed to establish that UBS’s failure to question donors about a history of syphilis, and to reject blood where a history of syphilis existed, was contrary to the practice of other members of the blood banking community. Dr. de Jongh admitted that he did not know of any blood bank in May 1984 that would reject a donor who had previously tested positive for syphilis but who tested negative at the time of the donation.
 

 In elaborating on the showing required under the professional standard of care, the
 
 Hutchins
 
 court stated that “[p]laintiff had to establish, by competent medical evidence, either that [the blood bank] did something blood bankers of ordinary care, skill and diligence would not have done under similar conditions, or it omitted to do something they would have done under similar circumstances.” 506 P.2d at 452. Clark was unable to satisfy the criteria specified in
 
 Hutchins.
 

 B. Questioning Donors About Prior Blood Transfusions
 

 In May of 1984, UBS’s screening procedure included asking donors whether they had been transfused in the past six months. When asked that question, John Donor indicated that he had not. John Donor’s deposition reveals that he received transfusions in Beverly Hills, California, in 1979 and 1980.
 

 Clark asserts that UBS was negligent in not questioning donors about transfusions received more than six months prior to the interview, and in not classifying such transfusion recipients as high-risk donors. Clark asserts that if UBS had inquired more deeply into the transfusion history of its donors, it would have rejected John Donor as a member of a high-risk group.
 

 
 *769
 
 At the time of John Donor’s May 10, 1984 donation, it was standard procedure to inquire about prior blood transfusions because of the risk of hepatitis, which is transmissible through blood. Transfusions occurring within six months of the interview were important because hepatitis could take six months to show up in a blood test.
 

 The various experts called by the parties disagreed as to whether transfusion recipients at the time of John Donor’s donation constituted a group at high risk for AIDS. This dispute, however, is not the decisive issue. As noted above, the critical question is whether UBS’s conduct fell below the industry standard. Clark’s experts were not able to validly identify any blood bank that questioned and rejected donors on the basis of transfusions received more than six months prior to the date of donation. Dr. de Jongh testified that in May of 1984, Charity Blood Bank questioned donors about prior transfusions beyond the six-month limitation. However, the donor questionnaire produced at trial that was in use at Charity in May of 1984 referred only to transfusions within the prior six months. Moreover, the AABB donor information pamphlet used at Charity in May of 1984 did not classify transfusion recipients as a high-risk group. In addition, staff from Charity testified that donors were not asked about, nor rejected because of, transfusions received more than six months previously. While the jury was entitled to believe Clark’s experts, Ewing v. Sargent, 87 Nev. 74, 78, 482 P.2d 819, 821-22 (1971), even if Dr. de Jongh’s testimony is believed, the practice of one blood bank in another part of the country does not establish the standard which must be met by UBS.
 

 In addition, UBS demonstrated that documents from the FDA, CDC and the AABB did not identify transfusion recipients as a group at increased risk for AIDS in May of 1984. Dr. de Jongh acknowledged that AABB standards are the standard of practice for blood banks, and also admitted that the “Important Notice” used by UBS to encourage voluntary deferral substantially complied with the AABB’s listing of AIDS risk groups. Dr. de Jongh also agreed that it was reasonable for a blood bank to rely on information from the CDC. Again, the trial evidence failed to establish that UBS was negligent.
 

 C. Surrogate Testing for AIDS
 

 As mentioned above, there was some discussion before the ELISA test was available about the advisability of using surrogate tests to detect people at increased risk for AIDS. Clark insists that
 
 *770
 
 UBS should have been using the core antibody test to detect hepatitis. UBS contends that it was using the most prevalent test for hepatitis — the surface antigen test — and that it had no duty to implement the core antibody test. UBS also maintains that, in any event, the test selected for detecting hepatitis was not relevant to the instant case.
 

 Clark’s experts discussed the perceived advantages of the core antibody test over the surface antigen test for detecting hepatitis. Conant opined that John Donor’s blood would have tested positive for hepatitis had the core antibody test been used, and thus would have been rejected. Dr. de Jongh testified that some blood that tests negative for hepatitis B on the surface antigen test will nevertheless test positive using the core antibody test. Clark’s experts did not establish, however, that it was the practice among the blood bank industry to use the core antibody test as a surrogate test for AIDS.
 

 Dr. de Jongh stated that Irwin Memorial Hospital in San Francisco was doing core antibody testing on blood in May of 1984. Dr. de Jongh, however, agreed that Reno (where John Donor’s blood was drawn) and San Francisco were not similar communities insofar as the risk of AIDS was concerned. Dr. de Jongh also admitted that his own blood bank at Charity Hospital was not regularly using the core antibody test in 1984 largely because of the expense involved and because the AABB did not require it. Moreover, Dr. de Jongh stated that he had never advocated core antibody testing as a surrogate for AIDS, only as a test for hepatitis. In addition, Dr. de Jongh agreed that the vast majority of blood banks in 1984 were not doing surrogate testing.
 

 We are forced to conclude from the record that Clark did not establish that UBS was negligent for failing to conduct core antibody surrogate testing in May of 1984. With the exception of Irwin Memorial Hospital in San Francisco, the surface antigen test appeared to be the generally accepted method used for detecting hepatitis. Moreover, issues concerning the respective merits of the two hepatitis tests are irrelevant to Clark’s claim that UBS negligently failed to protect its blood supply from the contamination of the HIV virus.
 

 In Kozup v. Georgetown University, 663 F.Supp. 1048 (D.D.C. 1987),
 
 aff’d in relevant part,
 
 851 F.2d 437 (D.C.Cir. 1988), the plaintiff asserted that the defendant blood bank should have invoked surrogate testing for AIDS as an additional screening measure. Although the plaintiff offered the opinions of two experts who supported his theory, the district court nonetheless granted summary judgment, stating:
 

 
 *771
 
 These two [experts’] opinions cannot alone create a standard of care or a prima facie case of negligence, where they are entirely in opposition to the standard prevailing at every hospital and blood bank in the nation. . . . Thus, as with the issue of donor screening, plaintiifs cannot establish a standard of care regarding surrogate tests from which the [American Red Cross] departed.
 

 Id.
 
 at 1057.
 

 The trial court, it appears, adopted the minority view in ruling that the opinion of one competent, qualified expert was enough to sustain the judgment against UBS. We conclude to the contrary and hold that esoteric expert opinion is insufficient to establish the standard of care for the blood banking community.
 

 Our decision today is consistent not only with the law, but also with sound public policy. In the uncertain years before the availability of a test for AIDS, blood banks had to reach a balance between measures intended to prevent the spread of the deadly disease and the necessity of maintaining an adequate blood supply. We think it unwise to second guess the efficacy of protective measures implemented after careful consideration and advice from the government and industry members. We note, however, that today’s decision requiring the application of a professional standard of care is limited to activities within the blood banking industry that require professional judgment. We are unable to conclude that every activity or procedure employed by blood banks requires or reflects the imprimatur of professional medical judgment, and thus an ordinary standard of care may apply in certain other instances.
 

 CONCLUSION
 

 Our disposition of this appeal makes it unnecessary to reach other issues raised by the parties. For the reasons discussed above, the district court’s order for a new trial is reversed and the cause remanded for entry of judgment in favor of United Blood Services.
 
 [6]
 

 [1]
 

 A test for detecting HIV became available between the May 1984 and May 1985 donations by John Donor.
 

 [2]
 

 The amicus curiae brief submitted by the College of American Pathologists was actually a copy of a brief it had previously submitted to the Colorado Supreme Court in a case dealing with similar issues.
 

 [3]
 

 Blood transfusion recipients were not among the identified high risk groups.
 

 [4]
 

 Despite concluding that the court of appeals erred in ruling that a general, nonprofessional standard of care applied to the blood banking industry, the Colorado Supreme Court held that Quintana was entitled to a new trial in order to attempt to prove that the national blood banking community’s standard of care was unreasonably deficient in view of the knowledge then available to more adequately protect against transmitting AIDS through contaminated blood. The trial court in
 
 Quintana
 
 had excluded the testimony of plaintiff’s experts which would have addressed the issue of whether the national standard of care in the blood banking community was negligently deficient. In the instant case, no expert testimony was excluded, and Brown elected to focus on UBS’s procedures compared against an ordinary standard of care rather than attack the adequacy of the prevailing industry standard.
 

 [5]
 

 We agree with the Colorado Supreme Court in
 
 Quintana
 
 that a plaintiff such as Quintana or Clark would be entitled to attempt to demonstrate that the professional standard of care prevailing in the industry was deficient when compared to advanced knowledge concerning new measures for providing greater protection against transmission of the AIDS virus. As indicated later in this opinion, however, we have concluded that Clark failed to prove, as a matter of law, that the procedures followed by UBS and the blood banking industry were negligently deficient. In particular, Clark did not attempt to prove that the standard prevailing in the blood banking community was negligently deficient. That issue is therefore not before this court.
 

 [6]
 

 The Honorable Miriam Shearing, Justice, did not participate in the decision of this matter.