Jason DOE, et al., Plaintiffs,

v.

The **AMERICAN NATIONAL RED CROSS, et al., Defendants.**

Civ. A. No. 2:92–1061.

United States District Court,
S.D. West Virginia,
Charleston Division.

March 25, 1994.

See also 845 F.Supp. 1152.

Susan Cannon–Ryan, Caldwell, Cannon–Ryan & Riffee, Charleston, WV, W. Harold Flowers, Jr., Maureen R. Witt, Steven C. Choquette, Holland & Hart, Denver, CO, for defendants.

Rebecca A. Betts, Robert D. Cline, Jr., King, Betts & Allen, Charleston, WV, Bruce M. Chadwick, David P. Gersch, David A. Wollin, Susan R. Benda, Ronald D. Lee, M. Sean Laane, Arnold & Porter, Washington, DC, Edward L. Wolf, Assoc. Gen. Counsel, American Red Cross, Washington, DC, for the American Nat. Red Cross, the American Red Cross Tri–State Blood Services Region.

Ralph C. Dusic, Jr., Dina M. Mohler, Kay, Casto, Chaney, Love & Wise, Charleston, WV, for Charleston Area Medical Center.

John N. Charnock, Jr., pro se.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are motions for summary judgment filed by defendants American National Red Cross ("ARC") and Charleston Area Medical Center ("CAMC"), and a motion for partial summary judgment filed by plaintiff. The Court concludes genuine issues of material fact exist which preclude summary judgment in favor of any party on any count of the complaint. To "salvage some results from the judicial effort involved in the denial of a motion for summary judgment," *Yale Transport Corp. v. Yellow Truck & Coach Mfg. Co.*, 3 F.R.D. 440, 441 (S.D.N.Y.1944), the Court will address issues of law requiring pretrial resolution.[1]

### I.

Plaintiff Jason Doe was born at CAMC on May 31, 1983. Shortly after the child's birth, the fontanelle, or "soft spot," in his head began closing prematurely causing his head to become misshapen. In August, 1983, Jason's parents, plaintiffs John and Mary Doe, consulted Dr. Carrell Caudill,[2] a neurosurgeon, who diagnosed Jason's condition as craniosynostosis[3] and recommended corrective surgery. Although Jason's condition was not life-threatening, failure to correct it would have resulted in physical deformity.

Prior to the August 23, 1983, surgery, Mr. Doe told Dr. Caudill he was concerned about the safety of the blood supply, and that

---

1. The summary judgment process and *Rule 56(d)*, Fed.R.Civ.P., can be used in a manner analogous to a pretrial order under *Rule 16(e)*, Fed.R.Civ.P., to narrow and define the issues for trial. *Capitol Records, Inc. v. Progress Record Distrib. Inc.*, 106 F.R.D. 25, 29 (N.D.Ill.1985); 10A Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2737 (1983 & Supp.1993).

2. Dr. Caudill, anesthesiologist J.K. Lilly, M.D., Neurological Associates, Inc., and General Anesthesia Services, Inc. were named as defendants but have since been dropped from the action.

3. "Craniosynostosis" is a premature ossification of the skull and obliteration of the sutures. The particular sutures involved determine the resultant shape of the malformed head. *Stedman's Medical Dictionary* 367 (25th ed. 1990).

should Jason require a transfusion, a directed blood donation could be obtained from a family member. Dr. Caudill said he did not believe Jason would require a transfusion, and that in any case, CAMC employed a blood recycling technique which would allow blood Jason lost during surgery to be reused for any necessary transfusion. Satisfied with Dr. Caudill's representations, Mr. Doe allowed the surgery to commence.[4]

The anesthesiology report compiled during Jason's surgery indicates the child lost between 10 and 20 percent of his blood volume during the operation. Jason also had low blood pressure and was anemic at the time of the surgery, factors counseling in favor of a transfusion. The doctors administered the transfusion, but never mentioned it to John and Mary Doe.

In the years following Jason's surgery, he developed and received treatment for numerous illnesses unusual for a child of his age and background. On October 17, 1990, Jason was admitted to the University of Virginia Health Sciences Center at Charlottesville, Virginia, with symptoms including slow weight gain, intermittent fever, a decline in intellectual functioning, and infection with unusual organisms; two days later, he was diagnosed with Human Immunodeficiency Virus ("HIV"), the virus that causes Acquired Immune Deficiency Syndrome ("AIDS"). An open-lung biopsy revealed Jason suffered from chronic pulmonary infiltration and HIV encephalopathy[5].

In October, 1990, a U.Va. Hospital physician, Dr. Frank Saulsbury, wrote CAMC requesting Jason's medical records. The records revealed Jason had received a transfusion of red blood cells during his 1983 surgery from a unit of blood supplied by ARC. Dr. Saulsbury contacted Dr. Mary Taylor, CAMC's blood bank supervisor, to inform her of Jason's diagnosis. Dr. Taylor eventually replied that the unit of blood which Jason received during his 1983 surgery was donated by a person who later died of AIDS.

ARC had known since the spring of 1988 that the unit of blood used for Jason's transfusion came from an HIV-positive donor. On June 24, 1988, Dr. Mabel Stevenson, the medical director of ARC's Tri–State Blood Services unit mailed a letter to Dr. Taylor requesting that CAMC initiate a "look-back investigation" to identify the recipients of the tainted unit of blood. Dr. Taylor denies receiving the letter.

At the time, CAMC's transfusion service retained its transfusion recipient records for five years. Consistent with the policy, the 1983 transfusion service records were destroyed in January, 1989, making a look-back investigation impossible. In January, 1990, Dr. Stevenson again wrote to Dr. Taylor, enclosing a copy of her previous letter. Dr. Taylor responded she was unable to determine who received the infected blood because of the records' destruction.

Plaintiffs brought this state-law negligence action,[6] alleging *inter alia* ARC did not screen prospective donors properly to prevent HIV-infected blood donations, failed to test donated blood with at least one surrogate test to detect the presence of HIV, and neglected its responsibility to educate physicians and medical facilities to allow directed blood donations so as to avoid transfusions of blood or blood products drawn from the general population, except in the absence of other alternatives. Plaintiffs also allege CAMC

---

**4.** Dr. Caudill states he does not recall this conversation with Mr. Doe specifically, although he says he was approached often by relatives of surgical patients who wished to give directed blood donations. He recalls no parent requesting a directed donation based on concerns about the safety of the blood supply.

Drs. Caudill and Lilly agree interoperative blood salvage was not possible during Jason's surgery, for the child lacked sufficient blood volume, and the procedure involved likely would have resulted in contamination of lost blood with bone dust.

**5.** "Encephalopathy" refers to a disease of the brain. *Stedman's Medical Dictionary* 508 (25th ed. 1990).

**6.** Plaintiffs brought this action in the Circuit Court of Kanawha County, West Virginia. Defendants removed the action to this Court based on *American National Red Cross v. S.G.,* —— U.S. ——, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992), in which the Supreme Court held the "sue and be sued" clause in ARC's charter confers federal jurisdiction over cases involving ARC. *Id.* at ——, 112 S.Ct. at 2472.

improperly failed to educate its physicians and staff about the risk of transfusion-associated AIDS, did not make directed donations routinely available to elective surgery patients although the hospital had implemented a policy permitting such donations, and failed to retain transfusion logs long enough to permit necessary look-back investigations.

## II.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." *Rule* 56(c), Fed.R.Civ.P. It is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), nor is it appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979) (quoting *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.1951)); *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991).

Where the party opposing summary judgment would have the burden of proof at trial, that party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be accorded the benefit of all favorable legal theories invoked by the evidence considered. *Charbonnages*, 597 F.2d at 414. Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie. *Charbonnages*, 597 F.2d at 414. Summary judgment is appropriate if the nonmoving

party fails to make a showing sufficient to establish the elements necessary to his or her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment has the initial burden of showing the information that it believes demonstrates absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

## III.

The predominant issue in the parties' motions for summary judgment involves the standard of care applicable to ARC and CAMC. Plaintiffs contend defendants' conduct should be judged under an ordinary negligence standard, measuring ARC's and CAMC's conduct in context of how a reasonably prudent person should have performed under the circumstances. Defendants argue they should be held to a professional standard of care, defined by the prevailing customs and practices of reasonably competent blood banks and hospitals in similar circumstances.

Both ARC and CAMC suggest the applicable standard of care is governed by West Virginia's Medical Professional Liability Act, W.Va.Code §§ 55–7B–1 to 55–7B–11. The Act provides in relevant portion a plaintiff alleging an injury or death resulted from the failure of a "health care provider"[7] to follow the accepted standard of care must prove the health care provider "failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances."

By its explicit terms, the Act does not apply to injuries that occurred before June 6, 1986.[8] W.Va.Code § 55–7B–10; *Robinson v. CAMC*, 186 W.Va. 720, 724, 414 S.E.2d 877, 881 (1991). Jason Doe received the transfu-

---

7. The Act defines "health care provider" as "a person, partnership, corporation, facility or institution licensed by, or certified in, this state or another state, to provide health care or professional health care services; including, but not limited to, a physician, osteopathic physician, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, or psychologist, or an officer,

employee or agent thereof acting in the course and scope of such officer's, employee's or agent's employment." W.Va.Code § 55–7B–2(c).

8. Though the Act does not define "injury," it is beyond serious dispute plaintiffs' injury occurred at the time of the August, 1983, transfusion.

sion at issue in August, 1983. West Virginia's Medical Professional Liability Act is therefore inapplicable, and does not determine the standard of care in this action.

The Court finds no guidance on this issue in W.Va.Code § 16–23–1, which declares the procuring or distributing of blood or blood products is not a sale, but a service, and is not subject to warranties. Nor is this determination governed by West Virginia's AIDS–Related Medical Testing and Records Confidentiality Act, W.Va.Code §§ 16–3C–1 *et seq.* The Court therefore must look to West Virginia's common law for direction.

The West Virginia Supreme Court has recognized a professional standard of negligence "applicable to any profession," *Keister v. Talbott,* 182 W.Va. 745, 748 n. 4, 391 S.E.2d 895, 898 n. 4 (1990). In *Keister,* the court held "[a]n attorney who undertakes to perform professional services for a client is required to exercise the knowledge, skill, and ability ordinarily possessed and exercised by members of the legal profession in similar circumstances." *Id.* at 748, 391 S.E.2d at 898. The court has approved a similar standard with regard to other professions. *See Murphy v. North Am. River Runners, Inc.,* 186 W.Va. 310, 412 S.E.2d 504 (1991) (whitewater rafting guide); *Weaver v. Union Carbide Corp.,* 180 W.Va. 556, 378 S.E.2d 105 (1989) (marriage counselor); *First Nat'l Bank of Bluefield v. Crawford,* 182 W.Va. 107, 386 S.E.2d 310 (1989) (accountant); *Brown v. Bluefield*

*Mun. Bldg. Comm'n,* 167 W.Va. 318, 280 S.E.2d 101 (1981) (medical doctor).

## A. STANDARD OF CARE APPLICABLE TO ARC

Although the West Virginia Supreme Court has never considered the standard of care applicable to blood banks specifically,[9] the "clear and growing consensus of jurisdictions ... view the production and safeguarding of the nation's blood supply as a professional activity, entitled to a professional standard of care." *Brown v. United Blood Services,* 109 Nev. 758, 858 P.2d 391, 396 (1993). The *Brown* court explained lucidly the rationale for viewing blood banking as a profession:

We are convinced that determinations concerning the testing of donated blood and the exclusion of categories of donors are better suited to professionally-trained members of the industry rather than lay persons. Such determinations require professional expertise in adopting procedures necessary for securing healthy blood and blood products without dangerously impacting the availability of adequate blood supplies.

*Id.*[10]

Because plaintiffs' complaint calls into question ARC's determinations and practices

---

**9.** Plaintiffs make much of the decision in *Foster v. Memorial Hosp. Ass'n of Charleston,* 159 W.Va. 147, 219 S.E.2d 916 (1975), where the court held a hospital's provision of blood to a patient constitutes a service, not a sale creating an implied warranty of fitness. *See* W.Va.Code § 16–23–1. The *Foster* court noted in passing that Florida courts had held "various transfers of blood may arguably be distinguished depending upon the source of the transfer." *Foster,* 159 W.Va. at 152 n. 4, 219 S.E.2d at 920 n. 4. Said the *Foster* court:

... Florida courts held that, on one hand, a hospital that supplies whole blood to a patient is merely performing a service incident to the over-all medical treatment being furnished and, therefore, the hospital is not liable in a cause of action brought against it for breach of implied warranty; on the other hand, the Florida courts held that a blood bank which originally collects, distributes and supplies blood to a hospital for consideration has in fact made a

sale and the blood bank is liable under implied warranty theory. [Citations omitted].
*Id.*

Although plaintiffs assert *Foster* indicates West Virginia does not view blood banks as professionals, and settles the applicable standard of care for its claims against ARC, this Court does not read *Foster* so broadly. *Foster* held that a transfusion recipient could not sue a hospital for breach of warranty, but only in tort to determine "whether the hospital met the standard of care." *Id.* at 153, 219 S.E.2d at 920. The case did not articulate the standard of care.

**10.** *See also, Smith v. Paslode Corp.,* 799 F.Supp. 960, 969 (E.D.Mo.1992), *aff'd,* 7 F.3d 116, 118 (8th Cir.1993) (professional standard of care requires Red Cross to "exercise the care commonly exercised by the ordinarily skillful, careful and prudent blood bank in its procurement, processing, distribution and use of blood products under the same or similar conditions"); *Smythe v. American Red Cross,* 797 F.Supp. 147, 152

with regard to blood testing and donor screenings, decisions requiring a high degree of specialized skill and scientific expertise, this Court is satisfied that under West Virginia law, ARC had the duty to exercise the degree of care commonly practiced by the ordinarily skillful, careful, and prudent blood bank or equivalent personnel in the same or similar circumstances.[11] Under this standard, ARC may be held liable if plaintiffs prove its practices fell below the standards promulgated and practiced by the blood-banking industry, or that the industry standards were themselves unacceptably deficient given the reliable data and knowledge available to the industry at the time of the contaminated transfusion.

This Court disagrees with ARC's assertion that compliance with industry standards conclusively establishes absence of negligence. Customary practice does not prescribe the duty of care. In *Texas & Pacific Ry. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903), Justice Holmes, citing one of the law's "commonplaces," wrote: "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *See also, Orthopedic Eq. Co. v. Eutsler*, 276 F.2d 455, 462 (4th Cir.1960); *Glover v. Yonce*, 188 F.2d 870, 874 (4th Cir.1951); *Bates v. Sirk*, 159 W.Va. 917, 922, 230 S.E.2d 738, 741 (1976); *see generally*, W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* ("Prosser"), § 33, at 193–95 (5th ed. 1984) ("Even an entire industry, by adopting such careless methods to save time, effort, or money, cannot be permitted to set its own uncontrolled standard").

In *United Blood Services v. Quintana*, 827 P.2d 509 (Colo.1992), the Colorado Supreme Court held that while a blood bank's conduct is to be evaluated under a professional standard of care, a plaintiff is entitled to attempt proof that the national blood-banking community's standard of care was unreasonably deficient in view of the knowledge then available to protect against transmitting AIDS through contaminated blood. The court wrote:

> If the standard adopted by a practicing profession were to be deemed conclusive proof of due care, the profession itself would be permitted to set the measure of its own legal liability, even though that measure might be far below a level of care readily attainable through the adoption of practices and procedures substantially more effective in protecting others against harm than the self-decreed standard of the profession.

*Quintana*, 827 P.2d at 520.

This reasoning is convincing, particularly where the defendant industry-participant wields disproportionate influence over the customs or policies of the entire industry. The *Quintana* court noted, "To be sure, there is a presumption that adherence to the applicable standard of care adopted by a profession constitutes due care for those practicing that profession. The presumption,

(N.D.N.Y.1992) ("in the context of medical negligence claims, the Red Cross and other volunteer blood collections organizations are held to the prevailing standard of care in their profession"); *Osborn v. Irwin Memorial Blood Bank*, 5 Cal.App. 4th 234, 7 Cal.Rptr.2d 101, 120 (1992) ("[T]he adequacy of a blood bank's actions to prevent the contamination of blood is a question of professional negligence and fulfillment of a professional standard of care"); *Seitzinger v. American Red Cross*, Nos. 90–0046 & 90–3890, 1992 WL 361700 at *7 (E.D.Pa. Nov. 30, 1992) (applying "a professional negligence standard of care" to govern the actions of a blood collector "despite the absence of statutory language evincing the standard of care"); *Wilson v. American Red Cross*, 600 So.2d 216, 218 (Ala.1992) ("the collection and processing of blood for transfusion is a medical service and ... the Red Cross, as a blood collector and processor, should be treated as a professional"); *Doe v. American Red Cross*, 297 S.C. 430, 377 S.E.2d 323, 326 (1989) (Red Cross held to a professional standard of care); *Kozup v. Georgetown Univ.*, 663 F.Supp. 1048, 1057–58 (D.D.C.1987), *aff'd in pertinent part*, 851 F.2d 437, 438 (D.C.Cir.1988) (blood bank was appropriately held by community standard in blood collection); *Sawyer v. Methodist Hosp.*, 522 F.2d 1102, 1105 (6th Cir.1975) (applying professional standard of care to blood bank); *Hutchins v. Blood Services of Montana*, 161 Mont. 359, 506 P.2d 449, 451–52 (1973) (same).

**11.** The Court does not mean to imply every activity or procedure employed by blood banks requires professional medical judgment. An ordinary standard of care may well apply to blood banks in other instances where more mundane services are involved.

however, is a rebuttable one, and the burden is on the one challenging the standard of care to rebut the presumption by competent evidence." *Id.* at 521. *See also, Brown,* 858 P.2d at 396 n. 5 (plaintiff is "entitled to attempt to demonstrate that the professional standard of care prevailing in the industry was deficient when compared to advanced knowledge concerning new measures for providing greater protection against transmission of the AIDS virus"); *Hernandez v. Nueces County Medical Soc'y Community Blood Bank,* 779 S.W.2d 867, 871 (Tex.Ct. App.1989) (evidence of compliance with federal and minimum licensing standards does not conclusively insulate blood bank from liability where there was evidence the blood bank may have "unduly lagged in the adoption of new screening procedures").

■ This Court adopts as law of this case the *Quintana* court's explanation of the practical operation of the professional standard:

If the jury is convinced by a preponderance of the evidence that the standard of care adopted by the defendant's school of practice is unreasonably deficient, it must resolve the issue of defendant's negligence on the basis of all the evidence concerning the practices and procedures available to the defendant's profession under the circumstances existing at the time of the events in question. If, on the other hand, the jury is not convinced by a preponderance of the evidence that the standard of care adopted by the defendant's school is unreasonably deficient, the jury must accept the standard of the defendant's school of practice as conclusive evidence of reasonable care and must determine the issue of negligence on the basis of defendant's

compliance or noncompliance with that standard.

*Quintana,* 827 P.2d at 521.

■ ARC has failed to meet its burden under Rule 56, Fed.R.Civ.P., of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–2553. Plaintiffs have produced evidence a reasonable jury could construe as establishing ARC and the blood-banking industry were dilatory in adopting techniques of more adequate protection against transmitting AIDS through contaminated blood.

Moreover, it is important to note that plaintiffs' claim arose when there was debate within the blood-banking community regarding the appropriate measures for responding to the potential for transmission of AIDS through the blood supply. There also was ongoing discussion between the blood-banking industry and the medical community regarding prevention of transmission of AIDS through blood transfusion. Plaintiffs' claim challenges ARC's conduct during this period of relatively rapid developments in this area of knowledge. Therefore, ARC's contention it adhered to *minimum* requirements established by national and governmental organizations does not preclude plaintiffs' contention ARC was not doing all it should have been doing under the circumstances.[12]

### B. STANDARD OF CARE APPLICABLE TO CAMC

■ The Court concludes as well CAMC is subject to a professional standard of care. The hospital was required to provide such care, skill, and learning required or expected of a reasonable, prudent hospital acting in the same or similar circumstances.[13]

12. Plaintiffs have submitted as evidence a report issued June 24, 1988, by the Presidential Commission on the Human Immunodeficiency Virus Epidemic concluding that "the initial response of the nation's blood banking industry to the possibility of contamination of the nation's blood by a new infectious agent was unnecessarily slow." The Commission recommended that the Blood Products Advisory Committee ("BPAC"), which advises the Food and Drug Administration about blood policy and procedures, be restructured to reflect "the entire blood products community, the plasma industry, and members of the related

academic community, as well as one or more public members." The BPAC's members in late 1982 and early 1983 consisted mainly of whole blood bankers.

13. West Virginia's Medical Professional Liability Act, W.Va.Code §§ 55–7B–1 to 55–7B–11, provides a professional standard of care applicable to actions alleging an injury or death resulted from failure of a health care provider to follow the accepted standard of care. W.Va.Code § 55–7B–3. The Act does not apply to this case. *See supra* pp. 1231–32.

■ West Virginia cases distinguish between medical malpractice actions and those alleging negligence on the part of a hospital; the former are analyzed under a professional standard of care, while the latter are viewed in context of the ordinary negligence standard. *Duling v. Bluefield Sanitarium, Inc.*, 149 W.Va. 567, 581–82, 142 S.E.2d 754, 764–65 (1965). The distinguishing factor is the necessity of professional skill in performance of the challenged conduct.

■ The *Duling* court noted the difference between the two types of action: "A private hospital may be held liable for injuries sustained by a patient as a result of the mere negligence of a physician employed by the hospital, as distinguished from the physician's unskillful treatment of the patient." *Id.* at 582, 142 S.E.2d at 764. Quoting *Hogan v. Clarksburg Hosp. Co.*, 63 W.Va. 84, 59 S.E. 943 (1907), the *Duling* court wrote that the question in an ordinary negligence action

> does not arise as to the skill, care, and attention of any physician.... That which is complained of in this case is not the wrong or unskillful application of remedies but the neglect to give that *reasonable and ordinary care and attention* which was needed and due to plaintiff after being received into the hospital at the hands of the employees of the defendant.

*Duling*, 149 W.Va. at 582, 142 S.E.2d at 764 (emphasis in original).

Plaintiffs' claims against CAMC do not constitute a medical malpractice action, for under West Virginia law, "[t]he essence of a medical malpractice action is a physician-patient relationship." *Rand v. Miller*, 185 W.Va. 705, 706, 408 S.E.2d 655, 656 (1991). Here, plaintiffs do not allege a professional relationship existed between Dr. Mary Taylor, CAMC's blood bank supervisor, and Jason Doe. But it is the requirement of professional skill, not merely the type of action involved, which dictates the applicable standard of care. *See, e.g.,* Prosser, § 32, at 185–93.

Like its claims against ARC, plaintiffs' allegations against CAMC involve decisions and practices which required specialized skill and medical knowledge. Plaintiffs allege Dr. Taylor negligently failed to perform numerous functions relating to hospital policy and procedure in response to the danger of transfusion-associated AIDS. These functions are not the type which might be performed by lay persons, because of the professional skill and knowledge required. Moreover, because Dr. Taylor's challenged conduct involved CAMC's response as an entity to a novel problem of concern to all physicians having her responsibilities, her actions cannot be viewed in isolation. Justice requires CAMC's conduct be judged in context of the common practices and procedures of reasonable hospitals in the same or similar circumstances.

This being said, evidence that CAMC complied with hospital industry standards would not establish absence of negligence conclusively. *See supra,* p. 1233. Adherence to customs or practices is evidence of due care; but plaintiffs still would be entitled to attempt proof that the industry standards were deficient. "Custom cannot excuse the failure to use ordinary care." *Virginia Elec. & Power Co. v. Carolina Peanut Co.*, 186 F.2d 816, 820 (4th Cir.1951).

CAMC has failed to demonstrate it is entitled to summary judgment. The hospital portrays itself as a minor player in this dispute, and essentially alleges ARC and the physicians who treated Jason Doe are the true culprits, if any exist. But CAMC itself has advanced the grounds for refuting its argument: "The hospital has uniquely non-delegable hospital functions as does a blood bank and each is liable for their respective duties which may be related but are not legally united." CAMC Br. at 16. Plaintiffs' claims against CAMC arise not from the conduct of others, but from CAMC's own policies and practices. CAMC has neither demonstrated the absence of genuine issues of material fact nor that it is entitled to judgment as a matter of law.

## IV.

The Court has carefully considered the other arguments advanced by the parties and concludes no grounds exist for summary judgment in favor of any party on any claim. Only where it is perfectly clear there are no

issues of material fact is summary judgment proper. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). Accordingly, the Court **DENIES** defendant ARC's motion for summary judgment, **DENIES** defendant CAMC's motion for summary judgment, and **DENIES** plaintiffs' motion for partial summary judgment. This action will proceed to trial as scheduled.

