NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official copy of the following opinion will be published by the

Supreme Court's Reporter of Decisions in the Official Reports

advance sheets following final action by the Court.

                                    

               Docket No. 79653--Agenda 12--January 1996.

         MARIETTA ADVINCULA, Appellee, v. UNITED BLOOD SERVICES,

                               Appellant.

                    Opinion filed December 19, 1996.

                                    

     JUSTICE FREEMAN delivered the opinion of the court:

     This case primarily concerns the standard of care under

section 3 of the Blood and Organ Transaction Liability Act (Blood

Shield Act) (Ill. Rev. Stat. 1983, ch. 111½, par. 5101 et seq.),

against which the conduct of a nonprofit blood bank charged with

negligence in collecting whole blood contaminated with the human

immunodeficiency virus (HIV) must be measured.

     Plaintiff, Marietta Advincula, as the special administrator of

the estate of her husband, Ronaldo Advincula, deceased, brought

wrongful death (Ill. Rev. Stat. 1983, ch. 70, par. 1 et seq.),

family expense (Ill. Rev. Stat. 1983, ch. 40, par. 1015), and

survival actions (Ill. Rev. Stat. 1983, ch. 110½, par. 27--6) in

the circuit court of Cook County against defendant, United Blood

Services (UBS). UBS operates nonprofit blood banks which collect

donated whole human blood and is an operating division of Blood

Systems, Inc., a nonprofit Arizona corporation.

     Following trial, the jury returned a verdict of $2.14 million

in plaintiff's favor on all claims. UBS filed a post-trial motion

for judgment notwithstanding the verdict or, alternatively, a new

trial. The trial court denied the motion, and defendant appealed.

     A sharply divided appellate panel affirmed, issuing three

separate published opinions: the majority opinion delivered by

Justice Scariano, a special concurrence by Justice DiVito, urging

remand for retrial, and a dissent by Justice McCormick. 274 Ill.

App. 3d 573. These published opinions addressed the appropriate

standard of care under section 3 of the Act and proper application

of the standard. A Supreme Court Rule 23 order (134 Ill. 2d R. 23)

addressed remaining issues, e.g., proof of proximate cause,

admissibility of expert opinion testimony and time-barring of the

survival action.

     Following the decision, the appellate court issued a

certificate of importance pursuant to Supreme Court Rule 316 (134

Ill. 2d R. 316) and article VI, section 4(c), of the Illinois

Constitution of 1970 (Ill. Const. 1970, art. VI, §4(c)). We assumed

jurisdiction and granted the American National Red Cross, the

American Association of Blood Banks (AABB), the American Blood

Resources Association (ABRA) and Abbott Laboratories permission to

file amicus curiae briefs in support of UBS. We granted similar

permission to the Illinois Trial Lawyers Association and the

Association of Trial Lawyers of America, which support plaintiff.

134 Ill. 2d R. 345. The thrust of the amici curiae support concerns

the interpretation of section 3 with respect to standard of care.

     Plaintiff initially moved unsuccessfully to dismiss the

appeal, contesting jurisdiction. Plaintiff states that she

incorporates that motion in her brief and requests its

reconsideration. Such request in this form is not properly before

the court. See Ill. Rev. Stat. 1983, ch. 110, par. 2--620; 134 Ill.

2d R. 361(a).

     Plaintiff also filed motions to strike portions of ABRA's

brief and the entirety of AABB's brief. Plaintiff's motions were

taken with the case. We find that information in ABRA's brief that

provides background to the Acquired Immune Deficiency Syndrome

(AIDS) crisis essentially appears within the record on appeal and

within the parties' briefs. Further, ABRA's views may be properly

expressed in its brief despite that it is an association of blood

plasma collecting organizations. We also find that AABB's brief,

describing the development of its association's standards and

recommendations, does not improperly expand the factual record

developed in the trial court as contended by plaintiff. See DeLuna

v. St. Elizabeth's Hospital, 147 Ill. 2d 57, 76 (1992). Plaintiff's

motions to strike are accordingly denied.

     Defendant requests that this court reverse the trial court's

judgment or, alternatively, remand for a new trial. After careful

consideration, we reverse the judgments of the appellate and

circuit courts and remand for a new trial.

                                BACKGROUND

     UBS operates 20 blood centers in 19 states, including a center

in Chicago. UBS conducts mobile blood drives, collecting whole

human blood from volunteer donors at churches, schools, and places

of employment throughout the Chicago metropolitan area. UBS belongs

to that sector of the blood banking community which receives

donations from volunteers as opposed to the commercial sector which

depends on paid donors.

     UBS is a member of the AABB, an association of blood banks and

blood banking professionals engaged in the collection of whole

blood from volunteer donors. AABB promulgates, establishes and

publishes standards and policies for the collection, processing and

distribution of blood, blood components and tissue by its members.

AABB also inspects and accredits its members based on compliance

with these standards and policies and issues advisory

recommendations and guidelines. Federal and state governments

generally accept AABB standards as authoritative.

     Blood banks in general are regulated, inspected and licensed

by the FDA. (21 U.S.C. §§321(g)(1)(B), 360(b) (1994); 42 U.S.C.

§§262(c), (d) (1994)). The Code of Federal Regulations also

requires that the suitability of a blood donor shall be determined

by or under the supervision of a qualified physician. See 21 C.F.R.

§640.3(a) (1995). Illinois treats blood banking similarly. See 210

ILCS 25/2--125 (West 1994) (medical director of blood bank

administers its technical and scientific operations); 210 ILCS

25/7--108 (West 1994) (blood bank may collect only with consent of

donor and under direction or delegated direction of medical

director). Transfusion medicine is a recognized medical specialty

with specific board certification.

     The initial spread of AIDS, a disease of unknown cause and

origin, presented detection challenges to the medical community

and, particularly, the blood banking community. AIDS in the United

States was first reported to the Centers for Disease Control (CDC)

in 1981. See 30 Morbidity and Mortality Weekly Report 250--52, 305-

-08 (June 5, July 3, 1981). AIDS's first known victims were male

homosexuals and intravenous drug abusers. See generally Kozop v.

Georgetown University, 663 F. Supp. 1048 (D.D.C. 1987), aff'd in

part & vacated in part, 851 F.2d 437 (D.C. Cir. 1988). By July

1982, after three hemophiliacs contracted AIDS, CDC hypothesized

that the disease was possibly transmitted through blood products.

31 Morbidity and Mortality Weekly Report 365, 366 (July 16, 1982).

At that time, no consensus was reached nor were recommendations

developed regarding that possibility among the various concerned

government public health organizations and the blood banking

community. Comment, Allocating the Costs of Transfusion--AIDS: An

Oregon Perspective, 73 Or. L. Rev. 1057, 1061 (1994); Kozop, 663 F.

Supp. at 1051.

     By January 1983, academics, physicians, government public

health organizations and members of the blood banking community met

as a workgroup to consider opportunities for preventing AIDS, posed

by person-to-person contact and by blood. In the absence of a

laboratory test that could detect the AIDS virus in blood, the

workgroup addressed the public health imperative of balancing the

risk of AIDS against the impact screening measures might have on

the nation's blood supply.

     In the area of AIDS transmission by blood, the workgroup

considered the benefits and risks posed by several screening

options. Educating volunteer donors to self-defer was considered

generally effective because such persons were known to be

altruistic. Directly questioning donors regarding their sexual

preferences and habits was believed to carry the risk of offending

and discouraging low-risk donors, while also possibly ineffectively

screening dishonest or alienated at-risk donors, which could

adversely result in a decreased national blood supply. Donations by

friends and family to specific recipients was not recommended by

blood banking physicians because such persons are often pressured

and, under such circumstances, might be less likely to admit high-

risk behavior. Finally, several laboratory tests, known as

surrogate tests, were between 66% and 88% effective in ultimately

identifying HIV-infected donors, but they also had a 5% false

positive rate, resulting in the rejection of safe blood. The tests

also increased the price of collection and distribution of blood

products.

     The workgroup reached no consensus regarding the best method

to effectively exclude high-risk donors. At the time, there were 11

possible reported cases of AIDS related to transmission by blood

and blood products. Kozop, 663 F. Supp. at 1051.  

     Shortly thereafter, major blood banking organizations and

associations with assistance from the National Gay Task Force, the

National Hemophilia Foundation and government public health

representatives issued the first in a series of joint statements

relating to the transmission of AIDS. Kozop, 663 F. Supp. at 1052.

The statement recommended that blood screening include questioning

donors to detect possible AIDS or exposure to persons with AIDS. 73

Or. L. Rev. at 1062-63.

     The United States Public Health Service Committee, comprised

of federal government public health organizations and the FDA,

similarly recommended that blood banks screen by educating donors

with information pamphlets describing high-risk groups so that

potential at-risk donors might exclude themselves. 32 Morbidity and

Mortality Weekly Report 101-04 (March 4, 1983). The FDA also

individually recommended voluntary self-deferral by potential at-

risk donors. The FDA recommended, as well, improved educational

programs for blood bank personnel to enable them to better assist

donors in recognizing AIDS symptoms.

     UBS revised its procedures, taking the course generally

recommended by these governmental agencies and blood banking

community associations and organizations, which did not include

directed donations, surrogate tests or direct questioning of

potential donors regarding their sexual preferences and habits.

     Conclusive proof that the AIDS virus was transmittable through

blood was first published in January 1984. J. Curran, Acquired

Immune Deficiency Syndrome (AIDS) Associated with Transfusions, 310

New Eng. J. Med. 69, 70 (1984); Kozop, 663 F. Supp. at 1052. In

February 1984, with one exception, none of the volunteer blood

banks in the United States, including those operated by government

public health agencies, screened donated blood with a surrogate

test for AIDS. One university blood bank experimentally screened

using the T-cell ratio test. No volunteer blood bank in the United

States used the hepatitis B core antibody surrogate test, the test

urged by plaintiff here.

     On February 11, 1984, UBS collected a unit of HIV-contaminated

blood from a donor, anonymously referred to as "John Donor," at a

volunteer blood drive held at a Catholic parish on Chicago's

southwest side. Later that month, the blood was transfused to the

deceased during open-heart bypass surgery at Illinois Masonic

Medical Center. Plaintiff alleged that defendant negligently failed

to screen the HIV-contaminated blood, resulting in the deceased's

contraction of AIDS and his eventual death, some four years

following the February 1984 transfusion.

     Specifically, plaintiff alleged that UBS inadequately educated

donors about high-risk behavior for AIDS exposure; did not conduct

the blood drive properly; did not directly question donors about

their sexual preferences or sexual practices; and did not implement

surrogate tests, before February 1984, although allegedly one test,

the hepatitis B core antibody test, was proven effective in

screening at-risk donors.

                                  ISSUES

     We are asked to decide whether: (1) the trial court properly

construed section 3 and applied the proper standard of care; (2)

plaintiff proved proximate cause; (3) plaintiff's expert witnesses'

testimony exceeded their permissible scope; and (4) UBS was

entitled to judgment due to the barring of plaintiff's Survival Act

claim for failure to meet statute of limitations filing

requirements.

                            STANDARD OF REVIEW

     Statutory construction is a question of law, and a reviewing

court will interpret a statute pursuant to its own judgment,

independent of, and not deferential to, that of the trial court.

See Arca v. Colonial Bank & Trust Co., 265 Ill. App. 3d 498 (1994);

Mellon Bank, N.A. v. Midwest Bank & Trust Co., 265 Ill. App. 3d 859

(1993). Similarly, where facts are not disputed, a reviewing court

may determine a question concerning limitations as a matter of law.

                       SECTION 3 OF BLOOD SHIELD ACT

     In order that there may be negligence or actionable

negligence, there must be a legal duty to exercise care in favor of

the person injured, a breach of such duty, and injury proximately

caused by that breach. See Curatola v. Village of Niles, 154 Ill.

2d 201 (1993). Section 3 of the Blood Shield Act, "Imposition of

liability," imposes a legal duty upon blood banks and their staffs

by stating:

               "Every person, firm or corporation involved in the

          rendition of any of the services described in Section 2

          warrants to the person, firm or corporation receiving the

          service and to the ultimate recipient that he has

          exercised due care and followed professional standards of

          care in providing the service according to the current

          state of the medical arts." (Emphasis added.) Ill. Rev.

          Stat. 1983, ch. 111½, par. 5103.

                                 ANALYSIS

                                     I

                Construction of Section 3--Standard of Care

     UBS claims that the trial and appellate courts erroneously

interpreted section 3 to allow UBS's conduct to be measured against

an ordinary reasonableness negligence standard of care. UBS

generally interprets section 3 as imposing an overriding obligation

to adhere to "professional standards of care" and a secondary

obligation to exercise "due care" in the conduct which conforms to

those standards. UBS claims that where professional standards of

care are duly adhered to, negligence liability does not arise.

     Plaintiff, on the other hand, claims that the interpretation

of section 3 adopted by the trial court and affirmed by the

appellate majority is correct. That is, under the express terms of

section 3, compliance with professional standards is not the sole

inquiry; if professional "standards" or rules are themselves

inadequate to constitute due care, then compliance with them does

not satisfy the statutory standard of care. Plaintiff generally

interprets section 3 as imposing an overriding obligation to

exercise due care and a subordinate obligation to follow

professional "standards," as in "rules."

     Essentially, the controversy concerns whether section 3 of the

Blood Shield Act contemplates a professional standard of care or an

ordinary, reasonableness standard of care, and whether satisfaction

of professional standards of care constitutes the lack of

negligence. See Comments, Blood Bank Liability to Recipients of HIV

Contaminated Blood, 18 U. Dayton L. Rev. 87, 98 nn. 100, 101

(1992).

     Initial reference to the underlying procedural background of

this case is helpful. Prior to trial, UBS moved for summary

judgment. UBS argued, inter alia, that it had adhered to prevailing

professional standards of care at the time of John Donor's blood

donation. In opposing the motion, plaintiff relied on HIV-blood-

transfusion decisions from other jurisdictions which rejected a

professional negligence standard of care in favor of an ordinary

negligence standard of care. See Doe v. American National Red

Cross, 798 F. Supp. 301, 306 (E.D.N.C. 1992) (interpreting

statutory provision stating, "[i]n the selection of donors due care

shall be exercised," to constitute ordinary negligence standard of

care). The trial court found that section 3 expressed a due care

"standard." The trial court denied UBS's motion, interpreting

section 3 to require a blood bank to exercise due care and "fill

[sic] professional standards."

     The trial court also ruled prior to trial that evidence

regarding the conduct of blood plasma centers that pay donors for

blood was not admissible to show whether UBS's conduct was

reasonable. However, over UBS's objections, some evidence was

admitted pertaining to the conduct of blood plasma centers in order

to show notice to UBS of alternative procedures and their

feasibility.

     On the eve of trial, plaintiff moved to confirm the applicable

standard of care. In the motion, plaintiff requested that the

court, in accord with its prior determination, "admit evidence and

instruct the jury according to the appropriate legal standards."

UBS, too, sought a statement of the applicable standard of care by

a motion in limine. Once again, UBS argued that section 3 imposed

a professional standard of care on blood banks. The trial court

ruled that the standard of care applicable at trial to UBS's

conduct would be that of a reasonably careful blood bank under

similar circumstances.

     At trial, over UBS's objection, Dr. E. Conant and Dr. Marcus

Francis were allowed to testify as experts concerning the standard

of care for blood banks in 1984. Dr. Conant was a dermatologist,

who chaired the California Task Force on AIDS. At the time of

trial, Dr. Conant had treated about 5,000 AIDS patients and had

studied, written and presented extensively regarding AIDS

transmission. Dr. Conant had no experience in blood banking

medicine, except for a part-time job in medical school prior to the

AIDS epidemic. Conant did not belong to any professional blood

banking association and, on more than one occasion, had been

prevented by courts from testifying because he was not an expert in

blood banking. Dr. Francis was a epidemiologist and virologist

formerly employed by the CDC. Dr. Francis had no experience in

blood banking, nor did he belong to any professional blood banking

organization. Initially, the trial court ruled that Dr. Francis

could not testify concerning the standard of care, but dispensed

with this limitation over UBS's objections. Dr. Francis testified,

inter alia, about methods he believed were available to blood banks

to prevent the spread of AIDS. Dr. Francis also testified that a

blood donor would cooperate when directly questioned regarding

sexual practices.

     At the close of evidence, the court instructed the jury that

UBS had a duty to use "due care for the safety of the plaintiff."

The trial court defined "due care" as:

          "the care that would be used by reasonably careful blood

          banks under circumstances similar to those shown by the

          evidence at and prior to the time Ronaldo Advincula

          contracted the HIV virus. The law does not say how

          reasonably careful blood banks would act under the

          circumstances. That is for you to decide."

Cf. Illinois Jury Pattern Instructions, Civil, No. 10.02 (3d ed.

1989) (hereinafter IPI Civil 3d).

     The jury was additionally instructed:

          "In determining whether the defendant exercised due care

          under the circumstances you may consider:

               a. whether defendant complied with its own internal

          policies and procedures;

               b. the knowledge and methods available at and prior

          to February 1984 to educate and screen donors and test

          blood;

               c. the practices and procedures of the blood banking

          industry for screening donors and testing blood;

               d. the government's recommendations and guidelines

          governing the collection and processing and distribution

          of blood and blood products."

Cf. IPI Civil 3d No. 105.03.01.

     In this court, each party specifically argues that the plain

language of section 3 supports its interpretation. UBS claims that

the provision's end phrase, "according to the current state of the

medical arts," modifies the dual obligation to both "exercise[ ]

due care" and "follow[ ] professional standards of care." Ill. Rev.

Stat. 1983, ch. 111½, par. 5103. As one amicus curiae states it,

"[t]he overarching reference to the `current state of the medical

arts' makes clear that the legislature intended negligence actions

against blood banks and blood and plasma processors to be governed

by a professional standard of care and that blood providers must

exercise due care in conforming to that standard."

     Like UBS, plaintiff also argues that the express terms of

section 3 impose dual obligations, but she interprets the phrase

"follow[ ] professional standards of care" as professional rules,

not legal standards of care. Plaintiff claims that UBS's

interpretation renders superfluous the first obligation, "to

exercise due care," which result violates a basic statutory

construction principle.

     The primary rule of statutory construction is to give effect

to the true intent of the legislature and inquiry into legislative

intent must begin with the language of the statute. People v. Lowe,

153 Ill. 2d 195 (1992). In order to determine legislative intent,

a statute must be read as a whole and all relevant parts must be

considered by the court. See Bonaguro v. County Officers Electoral

Board, 158 Ill. 2d 391 (1994).

     In doing so, courts must give statutory language its plain and

ordinary meaning. See People v. Brandon, 162 Ill. 2d 450 (1994). A

term of well-known legal significance can be presumed to have that

meaning in a statute. See Harris v. Manor Healthcare Corp., 111

Ill. 2d 350 (1986). Also, common law meanings of words and terms

may be assumed to apply in statutes dealing with new or different

subject matter, to the extent that they appear fitting and absent

evidence indicating a contrary meaning. 2B N. Singer, Sutherland on

Statutory Construction §50.3, at 103 (5th ed 1992). Equipped with

these principles, we examine the disputed language, "exercised due

care and followed professional standards of care in providing the

service according to the current state of the medical arts."

     A commonly accepted definition of "due care" is:

               "[j]ust, proper, and sufficient care, so far as the

          circumstances demand; the absence of negligence. That

          degree of care that a reasonable person can be expected

          to exercise ***. That care which an ordinarily prudent

          person would have exercised under the same or similar

          circumstances." Black's Law Dictionary 499 (6th ed.

          1990).

See also 28 Ill. L. & Prac. Negligence §25, at 24 (1957) ("due

care" often used as a controvertible term with "reasonable care"

and "ordinary care"); Langston v. Chicago & Northwestern Ry. Co.,

330 Ill. App. 260 (1946) (same), aff'd, 398 Ill. 248 (1947).

Webster's Third New International Dictionary 1811 (1986).

"Profession" is commonly defined as a vocation or occupation that

requires advanced education and training and involves intellectual

skills, such as medicine, law, theology, engineering, teaching,

etc. See Webster's New World Dictionary 1134 (2d Coll. ed. 1974);

see also Webster's Third International Dictionary 1811 (1986).

     The term "standard of care" is one of legal significance. In

common law negligence theory, a standard of care is generally

understood to mean a measure or rule against which a defendant's

conduct is to be measured. See W. Keeton, Prosser & Keeton on Torts

§§31, 32 (5th ed. 1984); see also 28 Ill. L. & Prac. Negligence

§§25, 24 (1957). Black's defines "standard of care" as "the degree

of care" which a reasonably prudent person should exercise in the

same or similar circumstances. Black's also states that in medical,

legal, etc., malpractice cases, a standard of care is applied to

measure the competence of the professional. Black's Law Dictionary

1404-05 (6th ed. 1990).

     The rule that courts must not disregard the plain language of

a statute operates only when the statute under consideration is

free from apparent ambiguity. See People v. Drakeford, 139 Ill. 2d

206 (1990); see also Roche v. City of Chicago, 818 F. Supp. 233

(N.D. Ill. 1993) (court may only look beyond statutory language

where it is ambiguous or inconclusive, or a literal interpretation

would lead to absurd result), aff'd, 24 F.3d 882 (7th Cir. 1994).

A statute is ambiguous when it is capable of being understood by

reasonably well-informed persons in two or more different senses,

thus warranting the consideration of other sources to ascertain the

legislative intent. See People v. Jameson, 162 Ill. 2d 282 (1994).

     If one relies only on commonly accepted and understood

meanings, section 3 appears ambiguous, seemingly indicating that a

blood bank's conduct is to be measured both by a lay, reasonable

person standard of care and by professional standards of care.

"And" joins "exercised due care" with "followed professional

standards of care," indicating that the two phrases are additional

to one another and implying that they are also grammatically

coordinate. Black's Law Dictionary 86 (6th ed. 1990); see also

Coalition for Political Honesty v. State Board of Elections, 65

Ill. 2d 453, 465 (1976).

     Further, under section 3, blood banks make both warranties

while "providing the service according to the current state of the

medical arts." Without any resolution concerning the intended

operation of the two warranties, it is impossible to determine

exactly what this qualifying phrase means. We conclude that section

3 is therefore ambiguous and requires construction.

     Valuable construction aids in interpreting an ambiguous

statute are the provision's legislative history and debates, and

the purposes and underlying policies. See 2A N. Singer, Sutherland

on Statutory Construction §§48.02, 48.13, at 308, 356 (5th ed.

1992); Brown v. Kirk, 64 Ill. 2d 144, 152-53 (1976).

     The legislative history of the Blood and Organ Transaction

Liability Act is not available, unfortunately, as a record. Pub.

Act 77--184, eff. July 2, 1971. However, it is well known that the

Act was enacted in response to Cunningham v. MacNeal Memorial

Hospital, 47 Ill. 2d 443 (1970). See Hill v. Jackson Park Hospital,

39 Ill. App. 3d 223 (1976). Cunningham held that whole blood is a

"product" for purposes of strict tort liability. Cunningham, 47

Ill. 2d at 447. The legislature responded by restricting the

liability of blood, human organ and tissue service providers to

instances of negligence and willful misconduct.

     Section 2, "Limitation of liability," fully accomplishes that

end by eliminating the strict liability exposure of such persons

and organizations with the statement that the "procuring,

furnishing, donating, processing, distributing or using" of human

whole blood, plasma, blood derivatives, human organs and tissue for

purposes of injection, transfusion, or transplantation in a human

body is the "rendition of a service" for purposes of tort and

contract liability. Ill. Rev. Stat. 1983, ch. 111½, par. 5102.

     A review of section 1, "Declaration of public policy," is also

instructive. Section 1 states:

               "[The] availability of scientific knowledge, skills

          and materials for the purpose of injecting, transfusing

          or transplanting human whole blood, plasma, blood

          products, blood derivatives and *** [other] organs or

          other human tissue is important to the health and welfare

          of the people of this State. The imposition of legal

          liability without fault upon the persons and

          organizations engaged in such scientific procedures

          inhibits the exercise of sound medical judgment and

          restricts the availability of important scientific

          knowledge, skills and materials." (Emphasis added.) Ill.

          Rev. Stat. 1983, ch. 111½, par. 5101.

The provision continues, declaring the state's policy to limit

liability to negligence and willful conduct and referring, again,

to the processes of making such materials available for human use

as "scientific procedures." Ill. Rev. Stat. 1983, ch. 111½, par.

5101.

     As expressly stated in section 1, the legislature viewed the

persons and organizations engaged in "scientific procedures" as

exercising "medical judgment" which would be inhibited by the

imposition of strict liability. The legislature also expressly

stated its belief that the availability of "important scientific

knowledge" and "skills" would be restricted by such an imposition.

Ill. Rev. Stat. 1983, ch. 111½, par. 5101. See also Hill v. Jackson

Park Hospital, 39 Ill. App. 3d 223, 225 (1976) (Act serves to

prevent "chilling effect" on the "exercise of sound medical

judgment"); Glass v. Ingalls Memorial Hospital, 32 Ill. App. 3d

237, 241 (1975) (Act ensures that strict liability will not

"impinge on the exercise of sound medical judgment in a field where

an individual's life might be at stake"). These clear expressions

reveal the legislative view concerning the types of judgments

involved in blood banking as well as the level of expertise

attendant to these "scientific procedures." Any construction of

section 3 must be consistent with these expressions of the Act's

purpose. See People v. Burpo, 164 Ill. 2d 261 (1995) (statute

should be given construction that is consistent with purposes and

policies of the statutes).

     Moreover, the legislature apparently deemed it necessary to

enact section 3, a provision which imposes a particular form of

statutory liability apart from existing common law negligence

liability, despite that the Act's express purpose was fully

accomplished by section 2. Accepting the express purpose of the

Act, there was no need for the legislature to go beyond section 2

in crafting a specific statutory liability for blood service

providers; existing common law negligence standards of care would

have sufficed.

     During legislative debates concerning a subsequent amendment

to section 3 (see Pub. Act 78--31, eff. June 22, 1973), one

legislator expressed his understanding that a basis for the "Blood

Labeling Bills" was a past shortage of blood to the extent that

physicians had to sometimes rely on purchased blood. The legislator

additionally stated that "certain protection" was given to

"[p]hysicians" and "[h]ospitals in that they are acting in good

faith and exercising due care in the transfer of blood to the

extent that it is *** possible to know the blood [sic] and

uncontaminated." 78th Ill. Gen. Assem., House Proceedings, June 13,

1973, at 67-68 (statements of Representative Lauer) (extending the

waiver of strict liability from July 1, 1973, to July 1, 1976). We

glean from these statements only that legislators assumed that

blood transferors, referred to as physicians and hospitals, were

shielded under the law because they act in good faith and exercise

due care in transferring blood to the extent of their knowledge.

     An additional statutory construction aid is the common law.

The common law, having been classified and arranged into a logical

system of doctrine, principles, rules and practices, furnishes one

of the most reliable backgrounds upon which analysis of the objects

and purposes of a statute can be determined. Tyrrell Gravel Co. v.

Carradus, 250 Ill. App. 3d 817 (1993); see also 2B N. Singer,

Sutherland on Statutory Construction §50.01, at 90 (5th ed. 1992).

It is appropriate then to rely on that body of law to interpret

section 3. See In re Balay, 113 B.R. 429 (N.D. Ill. 1990) (statute

should be construed so that it may be given effect and is consonant

with the common law.

     In Illinois, the basic standard of care in instances of

negligence is that of the "ordinarily careful person" (see IPI

Civil 3d No. 10.02) or "reasonably prudent" person (Cunis v.

Brennan, 56 Ill. 2d 372, 376 (1974)). This basic formulation

reflects the community's demand for a standard that is external and

objective. To be complete, however, a standard of care must also be

subjective, in that it makes proper allowance for the actor's

capacity to meet the risk apparent to him, and the circumstances

under which he must act. See W. Keeton, Prosser & Keeton on Torts

§32, at 173 (6th ed. 1995).

     Accordingly, the basic reasonable person standard allows for

and incorporates the physical characteristics of the defendant,

himself. See W. Keeton, Prosser & Keeton on Torts §32, at 175 (6th

ed. 1995); W. Curran, Professional Negligence--Some General

Comments, 12 Vand. L. Rev. 535, 536-37 (June 1959). Other

"circumstances" may be similarly incorporated into the reasonable

person standard. See W. Keeton, Prosser & Keeton on Torts §32, at

179 n.47 (6th ed. 1995) (citing Lewis v. Northern Illinois Gas Co.,

97 Ill. App. 3d 227 (1981), as applying standard of care that child

of actor's age, intelligence, capacity and experience would

exercise).

     The professional standard of care accomplishes this

incorporation of certain subjective qualities and circumstances.

Professionals are held to a particularized form of the basic

reasonable person standard because in addition to that degree of

care, they are expected to possess a higher degree of skill, care,

and learning than the average person. The common statement that due

care is the degree of care that a reasonable person is bound to

exercise is thus only a statement of the general negligence

standard of conduct or duty in its most basic terms. Professionals,

in general, are required not only to exercise reasonable care

(i.e., due care) in what they do, but also to possess and exercise

a standard minimum of special knowledge and ability. See W. Keeton,

Prosser & Keeton on Torts §32, at 185 (6th ed. 1995); see also

Miller v. DeWitt, 59 Ill. App. 2d 38 (1965) (while architect has

duty to act with reasonable care and diligence, the skill and

ability that an architect is bound to exercise is that ordinarily

required of architects).

     In Illinois, the established standard of care for all

professionals is stated as the use of the same degree of knowledge,

skill and ability as an ordinarily careful professional would

exercise under similar circumstances. Taake v. WHGK, Inc., 228 Ill.

App. 3d 692, 708 (1992) (same general standard of care applies to

all professionals, including architects); Eaves v. Hyster Co., 244

Ill. App. 3d 260, 264 (1993) (referring to IPI Civil 3d Nos.

105.01, 105.02, as applying to all professionals and requiring all

professionals to apply same degree of knowledge, skill and ability

as an ordinarily careful professional would exercise under similar

circumstances); see also Restatement (Second) of Torts §299A, at 73

(1965). This standard of care is utilized to measure the conduct of

a wide variety of both medical and nonmedical professions. See

Barth v. Reagan, 139 Ill. 2d 399, 407 (1990) (attorneys); Purtill

v. Hess, 111 Ill. 2d 229, 241-42 (1986) (physicians); Dolan v.

Galluzzo, 77 Ill. 2d 279, 281 (1979) (podiatric practitioner);

Rosenberg v. Miller, 247 Ill. App. 3d 1023, 1028-29 (1993)

(dentists); Margolies v. Landy & Rothbaum, 136 Ill. App. 3d 635,

638 (1985) (accountants); Horak v. Biris, 130 Ill. App. 3d 140

(1985) (social workers). The standard recognizes that lay jurors

are not equipped to determine what constitutes reasonable care in

professional conduct without measuring the actor's conduct against

that of other professionals. See generally W. Keeton, Prosser &

Keeton on Torts §32 (6th ed. 1995); see also Walski v. Tiesenga, 72

Ill. 2d 249, 261-62. (1978).

     Parenthetically, we note that in professional negligence

cases, unlike negligence actions in general, the plaintiff bears a

burden to establish the standard of care through expert witness

testimony. See Barth, 139 Ill. 2d 399; Walski, 72 Ill. 2d at 256;

Ohligschlager v. Proctor Community Hospital, 55 Ill. 2d 411 (1973);

see also IPI Civil 3d No. 105.01 (requiring expert witness

testimony or other evidence of professional standards to prove

professional standard of care). Moreover, a plaintiff does not

discharge this burden of proof by merely presenting expert

testimony which offers an opinion as to correct procedure or which

suggests, without more, that the witness would have conducted

himself differently than the defendant. The expert must base his

opinion upon recognized standards of competency in his profession.

A difference of opinion between acceptable but alternative courses

of conduct is not inconsistent with the exercise of due care. See

York v. Stiefel, 109 Ill. App. 3d 342, 350 (1982).

     In instances, however, where the professional's conduct is so

grossly negligent or the treatment so common that a layperson could

readily appraise it, no professional expert testimony or other such

relevant evidence is required. See Barth, 139 Ill. 2d at 407-08;

Walski, 72 Ill. 2d at 256.

     It remains the case, however, that while professional conduct

in Illinois will be measured against a professional standard, all

persons, including professionals, both medical and nonmedical, are

also obligated, generally, to exercise due care or ordinary care,

commensurate with the apparent risk. See O'Hara v. Holy Cross

Hospital, 137 Ill. 2d 332, 342 (1990); Walski, 72 Ill. 2d at 261;

Knight v. Haydary, 223 Ill. App. 3d 564, 571 (1992); Curry v.

Summer, 136 Ill. App. 3d 468, 477 (1985); see also W. Keeton,

Prosser & Keeton on Torts §32, at 185 (6th ed. 1995)

("[p]rofessional persons in general, and those who undertake any

work calling for special skill, are required not only to exercise

reasonable care in what they do, but also to possess a standard

minimum of special knowledge and ability"); W. Keeton, Prosser &

Keeton on Torts §53, at 356 (6th ed. 1995) (in negligence, duty is

always the same, to conform to legal standard of reasonable

conduct; what defendant must do or not do is question of standard

of conduct to satisfy duty).

     Section 3 then represents no more than a classic statement of

the general duty to which every professional is answerable, to

exercise due care, and the particularized measure of his conduct,

by professional standard of care. We therefore conclude that, under

section 3, a blood bank's conduct is to be measured against

"professional standards of care" while the bank is bound to

exercise care which is due.

     In arguing that section 3 contemplates merely a reasonableness

standard of care, plaintiff relies on authority that interprets the

term "due care" within a statute, to indicate a reasonableness

standard of care. See Doe, 798 F. Supp. 301. Where no express

standard of care is otherwise indicated in a statute, this view may

not be incorrect. See Restatement (Second) of Torts §285, Comment

d, at 21 (1965). However, in section 3, our legislature has

expressly provided that a blood bank and its staff additionally

warrant to "follow[ ] professional standards of care." See

generally Restatement (Second) of Torts §285, Comment b, at 21

(1965). Moreover, based on the inclusion of this phrase in section

3, the term "due care" cannot be construed to indicate merely a

reasonableness standard of care without creating surplusage. If the

legislature had intended that merely a reasonableness standard of

care apply, there was no need to include the term "followed

professional standards of care." See Hirschfield v. Barrett, 40

Ill. 2d 224, 230 (1968) ("The presence of surplusage *** is not to

be presumed in statutory or constitutional construction [citation],

and *** each word, clause or sentence must, if possible, be given

some reasonable meaning").

     Furthermore, by using the conjunction "and," the legislature

stated the phrase "professional standards of care" as though it

stood on equal footing with "due care." Yet, under the appellate

majority (274 Ill. App. 3d 573) and plaintiff's interpretation, the

phrase "professional standards of care" is made subordinate. We

further disagree with plaintiff that we should depart from accepted

statutory construction principles and view the phrase "professional

standards of care" to mean simply professional rules or standards.

Accepting plaintiff's view requires a drastic departure from the

accepted common law meaning of the term and renders the words "of

care" superfluous. Statutes should be construed, if possible, so

that no term is rendered superfluous or meaningless. Bonaguro v.

County Officers Electoral Board, 158 Ill. 2d 391 (1994).

     The parties also argued that the qualifying phrase, "in

providing the service according to the current state of the medical

arts," supports their respective positions regarding the standard

of care. Under the last antecedent doctrine, it is generally

accepted that a referential and qualifying phrase refers solely to

the last antecedent. In re Application for Judgment & Sale of

Delinquent Properties for the Tax Year 1989, 167 Ill. 2d 161, 169

(1995). The last antecedent is the last word, phrase or clause that

can be made an antecedent without impairing the meaning of the

sentence. See 1977 Ill. Att'y Gen. Op. 49.

     In section 3, the last antecedent of the qualifying end

phrase, "in providing the service according to the current state of

the medical arts," is the phrase "followed professional standards

of care." Significantly, there is no punctuation setting this

qualifying phrase apart from the sentence which precedes it, which

might connote that the phrase was intended to modify more remote

terms. See 2A N. Singer, Sutherland on Statutory Construction

§47.33, at 270 (5th ed. 1992). As a result, we construe the phrase

as referring to and qualifying only the immediately preceding

phrase, "followed professional standards of care."

     The qualifying phrase apparently refers to the condition of

medical science and arts at the time that blood services are

provided. This comports with the larger sense of the Act because

the legislature viewed the processes involved in making blood

available as "scientific procedures" and the organizations and

persons involved in these procedures as exercising "medical

judgments." Also, in line with reliance on common law concepts as

construction aids, it is logical that an element of

contemporaneousness ("current state") qualifies norms of conduct.

Thus, applying the doctrine, blood services providers warrant to

follow professional standards of care in accord with the existing

condition of medical arts. Construed thusly, the qualifying phrase

assures that any professional standard of care is decided according

to the state of the art at the time of the injury, rather than

retrospectively.

     Furthermore, use of the phrase "according to the current state

of the medical arts" by the legislature bears overall on the type

of standard of care contemplated by section 3. Use of these terms

indicates something other than merely an ordinary or reasonableness

standard of care.

     Plaintiff argues, however, that section 3 may not be construed

to state the standard of care applied to all professionals in

Illinois, including medical professionals, because that would

contravene the common law as shown by Darling v. Charleston

Community Memorial Hospital, 33 Ill. 2d 326 (1965). According to

plaintiff, a blood bank's conduct should be judged against the

standard of care applied to hospitals in Darling. See also IPI

Civil 3d No. 105.03.01.

     The trial and appellate courts viewed the term "due care" in

section 3 to indicate the standard of care of a reasonably careful

person (cf. IPI Civil 3d No. 10.02) modified to accommodate UBS's

status as a blood bank. The resulting standard of care parallelled

the standard applicable to hospitals as health care institutions.

See Darling, 33 Ill. 2d 326.

     Prior to Darling, a hospital faced negligence liability

exposure based only on ordinary negligence (Delling v. Lake View

Hospital Ass'n & Training School for Nurses, 310 Ill. App. 155

(1941)); the failure to use reasonable care in selection of staff

(Dayan v. Wood River Township Hospital, 18 Ill. App. 2d 263

(1958)); or on a theory of vicarious liability for the conduct of

employee or agent medical professionals (Stapler v. Brownstein, 261

Ill. App. 57 (1931)).

     With Darling, this court recognized a new and independent duty

of hospitals to review and supervise the treatment of their

patients that is administrative or managerial in character. See

Darling, 33 Ill. 2d 326; Greenberg v. Michael Reese Hospital, 83

Ill. 2d 282, 293 (1980) (duty concerns hospital's responsibilities

that are administrative or managerial); IPI Civil 3d No. 105.03.01,

Notes on Use (ordinarily, "this duty involves the hospital's own

management responsibility"); see also Johnson v. St. Bernard

Hospital, 79 Ill. App. 3d 709, 718 (1979) ("[i]t requires not

medical expertise, but administrative expertise, to enforce rules

and regulations" adopted to ensure smoothly run hospital and

adequate patient care); Pedroza v. Bryant, 101 Wash. 226, 677 P.2d

166 (1984) (Darling first introduced doctrine of hospital's

corporate negligence founded on responsibility to supervise and

review medical treatment provided by medical staff).

     This duty has been found based on claims that a hospital

administrated X-ray therapy (see Greenberg, 83 Ill. 2d at 293);

failed to require treatment and consultation by specialists, and

failed to review physicians' qualifications and competencies

(Andrews v. Northwestern Memorial Hospital, 184 Ill. App. 3d 486,

489 (1989)); or failed to make available a specially trained nurse

for its nursery (Northern Trust Co. v. Louis A. Weiss Memorial

Hospital, 143 Ill. App. 3d 479 (1986)).

     A hospital, in fulfilling this duty, must conform to the legal

standard of "reasonable conduct" in light of the apparent risk. See

Ohligschlager v. Proctor Community Hospital, 55 Ill. 2d 411, 420

(1973); Darling, 33 Ill. 2d at 331; see also IPI Civil 3d No.

105.03.01, Notes on Use ("a duty to exercise ordinary care"). What

a hospital must do to satisfy the duty is act as would a

"reasonably careful" hospital under circumstances similar to those

shown by the evidence. See IPI Civil 3d No. 105.03.01, Notes on Use

(directing the additional use of a modified IPI Civil 3d No.

10.02). Whether a hospital is reasonably careful may be shown by a

wide variety of evidence, including, but not limited to, expert

testimony, hospital bylaws, statutes, accreditation standards,

custom and community practice. Darling, 33 Ill. 2d 326; Andrews v.

Northwestern Memorial Hospital, 184 Ill. App. 3d 486 (1989). When

IPI Civil 3d No. 10.02 is used to instruct a jury, as in the

present case, the jury is told that it decides how a reasonably

careful hospital would act. Thus, a hospital's conduct is measured

against what a lay jury considers reasonable under the

circumstances.

     In contrast, the standard of care applied to hospitals in

cases based on their vicarious liability for the conduct of agent

or employee medical professionals remains the standard applied to

all professionals, i.e., to use that same degree of knowledge,

skill and ability as an ordinarily careful professional would

exercise under similar circumstances. See IPI Civil 3d No.

105.03.01, Notes on Use (directing that IPI Civil 3d No. 105.01 be

used rather than No. 105.03.01 in cases of vicarious liability for

the conduct of professionals). In contrast, also, to the duty

instruction used for hospital institutional negligence, the

traditional professional duty instruction directs the jury that it

may not attempt to assess a defendant's conduct from any personal

knowledge. See IPI Civil 3d Nos. 105.01, 105.02.

     UBS views its development and implementation of a blood

screening policy in the face of AIDS as distinguished from the

administrative or managerial responsibilities carried out by

hospitals under Darling. UBS asserts that its allegedly negligent

conduct in developing policy and practices for screening the blood

supply concerned matters involving medical judgment. Plaintiff

responds that in Greenberg, 83 Ill. 2d at 293, a hospital case,

this court, applying the standard of care utilized in Darling,

acknowledged that such responsibilities involve medical judgment.

Plaintiff therefore concludes that the standard of care applied in

Darling and Greenberg must hold sway here.

     Plaintiff additionally claims that the record here

demonstrates that a professional standard of care should not apply

under section 3. According to plaintiff, UBS's top corporate

officer had ultimate authority for its AIDS procedures; several of

UBS's donor screening and high-risk blood testing policies and

procedures were set forth in memoranda written by businessmen; the

blood drive at issue here was not conducted under the supervision

of a physician; and the person who screened John Donor was not a

licensed medical professional. Plaintiff claims that the fact that

UBS's medical director is a licensed physician should not convert

a negligence action against UBS as an entity into a professional

malpractice action.

     The distinction between the legislature's approval of the

professional standard of care in section 3 as the measure of a

blood bank's allegedly negligent activities in collecting blood and

Darling's use of a reasonableness standard of care encompasses more

than the matter of medical judgment. Darling imposed negligence

liability upon health care institutions, including hospitals, that

had not existed previously under common law. The area of liability

recognized by Darling does not encompass, whatsoever, a hospital's

responsibility for the conduct of its agent or employee medical

professionals. By contrast, the statutory liability imposed by

section 3 upon human blood, organ and tissue service providers

("[e]very person, firm or corporation involved") in "procuring,

furnishing, donating, processing, distributing or using whole

blood" includes responsibility for the conduct of agent and

employee medical professionals. See Ill. Rev. Stat. 1983, ch. 111½,

pars. 5102, 5103. Notably, where a hospital is held responsible for

the conduct of its agent or employee medical professionals, under

vicarious liability, a hospital's conduct is measured, as in

section 3, against a professional standard of care.

     Furthermore, the legislature was presumably aware of Darling

when it enacted the Blood Shield Act. See 2B N. Singer, Sutherland

on Statutory Construction §50.01, at 90 (5th ed. 1992). Yet,

despite Darling's creation of a form of negligence liability,

utilizing a reasonableness standard of care, and arguably

applicable to human blood, tissue and organ service provider

institutions, the legislature saw fit to enact both sections 2 and

3, setting out negligence liability with a different scope.

     The fact that human blood, tissue and organ service providers

bear direct responsibility for the conduct of medical

professionals, and that hospitals, under Darling, do not, directly

implicates the standard of care against which their conduct may be

measured. As discussed previously, a professional standard of care

is traditionally utilized to judge professional conduct and

clearly, under the Act, the conduct of blood banks includes that of

its medical professional staff.

     Moreover, the legislature also expressly recognized that the

actual activities of human blood, tissue and organ service

providers involves a level of "medical judgment" sufficient to

warrant statutory protection. See Ill. Rev. Stat. 1983, ch. 111½,

par. 5101. That the statutory protection curtailed the imposition

of strict liability, but not negligence liability, does not

diminish the legislature's view of the significance of medical

judgment in this arena. By contrast, Greenberg only reveals this

court's acknowledgment that part of a hospital's administration

involves medical judgment. Greenberg, 83 Ill. 2d at 293. The

Greenberg court made this acknowledgment within the confines of

rejecting the evidentiary rule which requires that adverse expert

witnesses, testifying to medical negligence, be licensed in the

same school of medicine as the defendant (see Dolan v. Galluzzo, 77

Ill. 2d 279 (1979)). Greenberg, 83 Ill. 2d at 291-93.

     Also, Darling arose from a consideration of the breadth of a

modern day hospital's operational realities. The court's discussion

in Darling and Greenberg illustrates this breadth:

          "Present-day hospitals, as their manner of operation

          plainly demonstrates, do far more than furnish facilities

          for treatment. They regularly employ on a salary basis a

          large staff of physicians, nurses and interns, as well as

          administrative and manual workers, and they charge

          patients for medical care and treatment, collecting for

          such services, if necessary, by legal action." Darling,

          33 Ill. 2d at 332.

Greenberg expanded on this theme, stating that a "modern hospital

*** is an amalgam of many individuals not all of whom are licensed

medical practitioners *** [and] it is clear that at times a

hospital functions far beyond the narrow sphere of medical

practice." Greenberg, 83 Ill. 2d at 293; see also Pedroza, 101

Wash. at 231, 677 P.2d at 169 (Darling's newly recognized "doctrine

of corporate negligence reflects public's perception of modern

hospital as multifaceted health care facility responsible for

quality of medical care and treatment rendered"); A. Southwick, The

Hospital as an Institution--Expanding Responsibilities Change its

Relationship with the Staff Physician, 9 Cal. W. L. Rev. 429, 429

(1973) (community hospital has evolved into corporate institution,

assuming "the role of a comprehensive health center ultimately

responsible for arranging and co-ordinating total health care").

     Notably, it is the inherent diversity in hospital

administration which permits a broad range of evidence, including

expert witness testimony, administrative rules and regulations, to

establish the reasonableness standard of care, but does not call

necessarily for such proofs. This relationship contrasts with that

between professional conduct and proofs relevant to establish the

appropriate professional standard of care; such proofs in the form

of expert witness testimony or other evidence of professional

standards are generally required because they are generally

necessary to evaluate conduct which is likely arcane to lay jurors.

Cf. IPI Civil 3d Nos. 105.01, 105.03.01; Ellig v. Delnor Community

Hospital, 237 Ill. App. 3d 396, 414 (1992) (discussing probable

jury confusion resulting from use of IPI Civil 3d Nos. 105.01 and

105.03.01 together).

     Unlike hospitals, blood service providers, within the purview

of the Act, engage in a rather finite range of medically focused

services ("procuring, furnishing, donating, processing,

distributing" human blood, bones, organs and tissues for

"injecting, transfusing or transplanting" within the human body).

Ill. Rev. Stat. 1983, ch. 111½, par. 5102. Clearly, these services

do not compare to the recognized broad range of administrative

activities of modern hospitals contemplated by Darling and its

progeny. Clearly, also, by their very nature, the services of such

blood providers, under the Act, more closely involve medical

judgments than do the diverse administrative and managerial

activities performed by hospitals.

     Furthermore, even though administration may be necessarily a

part of a blood service provider's provision of services in a given

case, that fact does not argue against the construction of a

professional standard of care in section 3. As mentioned

previously, where conduct is within the "common knowledge" of a

jury, expert opinion testimony is not required to establish a

professional standard of care. See IPI Civil 3d No. 105.01, Notes

on Use.

     We therefore conclude that the common law is not contravened

by construing section 3 to require application of a professional

standard of care to blood banks. That hospital administration

entails some matters involving medical judgment does not support a

construction of section 3 requiring a reasonableness standard of

care. There also exists sufficient distinctions between the

situations of hospitals and blood banks to warrant the conclusion

that Darling's reasonableness standard of care need not be the

standard of care intended by the legislature in section 3. We are

convinced that common law considerations and the terms of the Blood

Shield Act establish that conduct within the Act's purview was

intended to be evaluated against the standard of care applicable to

professional conduct.

     Neither are we persuaded that the instant case demonstrates

that a construction of section 3 requiring the professional

standard of care is ill-founded. While the announcement of UBS's

policy and procedural decisions regarding the screening of donated

blood was disseminated via corporate memoranda and the screening

procedures at the instant blood drive were conducted by

nonprofessionals, the corporate decisions and implementation of

procedures yet resulted from initial review by UBS's medical

director, Dr. Earnest Simon. Dr. Simon's judgments concerned

developing an effective methodology for procuring an adequate human

blood supply for the nation balanced against the unknown risks of

a highly infectious, newly discovered, and fatal disease. As such,

Dr. Simon's judgments required the balancing of competing medical

policies and procedures and was an exercise of medical judgment

with vast public health implications. We are not prepared to say

that such undertakings did not involve medical judgments as

compared against, for example, a hospital's administration of X-ray

therapy, which plaintiff here relies on as a medical judgment. In

this case, the record reflects that UBS's decision to refrain from

possibly premature or ill-advised surrogate testing and to employ

education and self-deferral of donors as opposed to directly

questioning them about their sexual preferences involved scientific

and professional judgments contemplated by the Act.

     The application of a professional standard of care to the

conduct of blood banking organizations in collecting blood comports

with a majority of jurisdictions which have considered this issue,

in a variety of contexts. See Brown v. United Blood Services, 109

Nev. 758, 766, 858 P.2d 391, 396 (1993) (joining a "clear and

growing consensus of jurisdictions" that view production and

safeguarding of nation's blood supply as professional activity,

entitled to professional standard of care); Giorno v. Temple

University Hospital, 875 F. Supp. 267 (E.D. Pa. 1995); Doe v.

American National Red Cross, 848 F. Supp. 1228 (S.D. W. Va. 1994);

Smith v. Paslode Corp., 799 F. Supp. 960 (E.D. Mo. 1992), aff'd in

part & rev'd in part, 7 F.3d 116 (8th Cir. 1993); Smythe v.

American Red Cross Blood Services Northeastern New York Region, 797

F. Supp. 147 (N.D. N.Y. 1992); Zaccone v. American Red Cross, 872

F. Supp. 457 (N.D. Ohio 1994); Seitzinger v. American Red Cross,

Nos. 90--0046, 90--3890 cons. (E.D. Pa. November 30, 1992) (mem.);

Wilson v. American Red Cross, 600 So. 2d 216 (Ala. 1992); Spann v.

Irwin Memorial Blood Centers, 34 Cal. App. 4th 644, 40 Cal. Rptr.

2d 360 (1995); Wilson v. Irwin Memorial Blood Bank, 14 Cal. App.

4th 1315, 1317, 18 Cal. Rptr. 2d 517, 518 (1993); Osborn v. Irwin

Memorial Blood Bank, 5 Cal. App. 4th 234, 7 Cal. Rptr. 2d 101

(1992); United Blood Services v. Quintana, 827 P.2d 509 (Colo.

1992); Bradway v. American National Red Cross, 263 Ga. 19, 426

S.E.2d 849 (1993); Anonymous Blood Recipient v. William Beamont

Hospital & Southeastern Michigan Chapter American Red Cross, No.

89--363705--NH (Cir. Ct. Oakland County, Mi. 1991); Doe v. American

Red Cross Blood Services, 297 S.C. 430, 377 S.E.2d 323 (1989); but

see Kozop v. Georgetown University, 663 F. Supp. 1048 (D.D.C.

1987); Snyder v. American Ass'n of Blood Banks & Mekhjian, 144 N.J.

269, 676 A.2d 1036 (1996); Gilmore v. St. Anthony Hospital, 598

P.2d 1200 (Okla. 1979); 

     The Brown court explained very well the rationale for viewing

blood banking as a profession:

          "We are convinced that determinations concerning the

          testing of donated blood and the exclusion of categories

          of donors are better suited to professionally-trained

          members of the industry rather than laypersons. Such

          determinations require professional expertise in adopting

          procedures necessary for securing healthy blood and blood

          products without dangerously impacting the availability

          of adequate blood supplies." Brown, 109 Nev. at 766, 858

          P.2d at 396.

     Finally, UBS makes the argument that under the terms of

section 3, only the noncompliance with professional standards of

care can give rise to liability. UBS asserts that a blood bank

warrants to exercise due care "in following" the standards of the

profession which are each in accord with the current state of the

medical arts. UBS posits that use of such language indicates that

custom and practice within the profession are therefore conclusive

of the entire duty owed.

     UBS's argument requires that the word "in" be inserted into

the phrase "followed professional standards of care." Introducing

this word creates the impression that the entire measure of "due

care" is found by "following professional standards of care." We

reject this interpretation, finding no indication, whatsoever,

within section 3 that following professional standards of care

fulfills the general duty to exercise "due care."

     In the absence of any such indication within section 3, we

again turn to the common law as a construction aid to determine

whether the legislature intended that conformance to professional

standards of care necessarily satisfies a blood bank's entire duty.

In the area of ordinary negligence as well as in professional

negligence, including hospital institutional negligence, custom and

practice play a significant role. Generally speaking, custom and

practice assist in determining the standard of care, whether the

standard is that of a layperson, a health care institution, or a

professional. Barth v. Reagan, 139 Ill. 2d 399 (1990) (attorney's

professional negligence); Darling, 33 Ill. 2d at 331 (hospital

institutional negligence); Walski v. Tiesenga, 72 Ill. 2d 249

(1978) (medical professional negligence); Denniston v. Skelly Oil

Co., 47 Ill. App. 3d 1054 (1977) (ordinary negligence); Martin v.

Central Engineering Co., 350 Ill. App. 589 (1953) (engineer's

professional negligence).

     In Illinois negligence law, while custom and practice can

assist in determining what is proper conduct, they are not

conclusive necessarily of it. See Darling, 33 Ill. 2d at 331-32

(health care institutional negligence); Petrowsky v. Family Service

of Decatur, Inc., 165 Ill. App. 3d 32 (1987) (negligence claim

against adoption agency). This precept holds true even in the area

of medical professional negligence. In a professional malpractice

case, where expert testimony is required to establish the requisite

professional standard of care, evidence that a defendant's conduct

conformed with local usage or general custom indicates due care,

but may not be conclusive of it. Such evidence may be overcome by

contrary expert testimony (or its equivalent) that the prevailing

professional standard of care, itself, constitutes negligence. See

Chiero v. Chicago Osteopathic Hospital, 74 Ill. App. 3d 166 (1979);

Lundahl v. Rockford Memorial Hospital Ass'n, 93 Ill. App. 2d 461

(1968)); but see Sheahan v. Dexter, 136 Ill. App. 3d 241, 248

(1985). Under Illinois common law, although uncommon, parties may

dispute both the prevailing professional standard of care (see

Wilsman v. Sloniewicz, 172 Ill App. 3d 492 (1988)) and whether the

prevailing professional standard was deficient (see T. LeBlang & W.

Bonantra, The Law of Medical Practice in Illinois §4:13, at 425-26

(1986)). This does not mean that such professionals (or blood

handlers) are therefore subjected to both a professional standard

of care and a lay reasonableness standard of care. It means that,

ultimately, the professional standard must be one which provides

care which is due or reasonable. This means that the professional

standard of care, itself, must be shown to be sufficient or lacking

in this regard by means of expert testimony or other relevant

proofs, but not that the defendant's conduct be measured against

what a lay jury considers as reasonable. While the Act did away

with common law strict liability, there is no indication within the

statute that the legislature intended to further deviate in this

area from the common law.

     Accordingly, we hold that, under section 3, conformance with

professional standards of care, proven by expert testimony or other

evidence of professional standards, is indicative but not

conclusive of due care. Such evidence may be overcome by a

sufficient showing of contrary expert opinion testimony (or its

equivalent) that the prevailing professional custom or usage itself

constitutes negligence. See Chiero, 74 Ill. App. 3d at 174.

     Our construction of section 3 comports with rules adopted in

this area by courts in other jurisdictions. See United Blood

Services v. Quintana, 827 P.2d 509 (Colo. 1992) (while defendant

blood bank judged by professional standard of care imposed under

blood shield statute, evidence of compliance not conclusive proof

of "due care"); Doe v. American National Red Cross, 848 F. Supp.

1228 (S.D.W. Va. 1994) (professional standard of care applied, but

not conclusive of "due care").

     UBS makes one final claim, however, that permitting a jury to

find professional standards to be themselves negligent, as urged by

plaintiff, allows for the imposition of strict liability, contrary

to the express legislative intent in section 3. According to UBS's

"strict liability" argument, if a blood bank conforms to

"professional standards" by refraining from using unproven

surrogate testing, it may nonetheless be found negligent under a

conflicting "due care" standard of care for failing to institute

such tests.

     UBS's "strict liability" argument presupposes an incorrect

construction of section 3 premised on a conflict between the

phrases "followed due care" and "exercised professional standards

of care." As previously discussed, a proper construction of section

3 reveals that these two phrases do not conflict. Thus, we disagree

with UBS that section 3 allows for the imposition of strict

liability.

     The construction of the disputed language in section 3 is

complete. Based on the express statement in section 3 that blood

service providers warrant that they have "follow[ed] professional

standards of care," the statute as a whole, and statutory

construction principles, we conclude that the legislature intended

that a blood bank's conduct be measured against a professional

standard of care. Section 3 does not allow a blood bank's conduct

to be measured against merely a lay reasonableness standard of

care. Blood banks must nonetheless generally exercise that degree

of care known as due care.

     Section 3 simply does not indicate, nor does Illinois common

law agree, that conforming to professional standards of care in all

instances equates with due care.

     Our decision regarding this issue requires reversal and remand

for retrial. See Tankersley v. Peabody Coal Co., 31 Ill. 2d 496,

501 (1964); see also Lazarus v. Pascucci, 74 Ill. App. 3d 633, 640

(1979). The trial court misinterpreted section 3 to allow for

application of merely a reasonableness standard of care, rather

than a professional standard of care. In this case, despite that

expert opinion testimony was presented and that UBS's conduct was

measured against similar entities, the jury was free to disregard

that evidence and/or decide the reasonableness of UBS's conduct

based on the jury's own knowledge as well. The trial court's ruling

represented a clear error of law impacting not only on the legal

standard against which UBS's conduct was measured, but on the

plaintiff's burden of proof, the scope and qualification of expert

opinion testimony, and the application of the standard of care by

way of instruction to the jury (cf. Roberts v. Sisters of St.

Francis Health Services, Inc., 198 Ill. App. 3d 891, 903 (1990)).

In sum, the entire trial was affected by this error. Fairness

mandates that the cause be reversed and remanded for retrial.

                                    II

                            Survival Act Claim

     With the exception of UBS's claim that plaintiff's Survival

Act claim was time-barred, the remaining issues relate to

evidentiary matters, failure to prove proximate cause, and

irrelevancy of certain expert opinion testimony, which may not

arise upon retrial. In order, however, to resolve claims of error

which may reoccur on retrial (Sparling v. Peabody Coal Co., 59 Ill.

2d 491, 500 (1974)), we address whether UBS was entitled to

judgment based on the time-barring of the Survival Act claim.

     The record reveals the following. Dr. Mario Oliveros, the

Advincula family physician, testified that he had advised plaintiff

sometime during the period of April 29, 1987, through May 16, 1987,

that he suspected the deceased had contracted AIDS. Plaintiff

testified that, on May 27, 1987, she was first informed the

deceased had contracted AIDS. It is undisputed that the deceased

himself was informed of that fact several days later. Plaintiff, as

the administrator of the deceased's estate, filed the Survival Act

claim on May 26, 1989, less than two years after the deceased had

learned of his injury. See Ill. Rev. Stat. 1983, ch. 110, par. 13--

202.

     Following trial, the jury returned a verdict in plaintiff's

favor and awarded damages of $1.5 million for the deceased's pain

and suffering. UBS motioned for judgment notwithstanding the

verdict, which the trial court subsequently denied.

     On appeal, UBS contends that plaintiff's survival claim was

time-barred by the two-year statute of limitations applicable to

personal injury actions. Ill. Rev. Stat. 1983, ch. 110, par. 13--

202. UBS asserts that the discovery rule should not be applied here

to salvage plaintiff's claim because its purposes are not served.

UBS additionally asserts that the plaintiff brought the claim more

than two years after she had reason to know the deceased had AIDS.

Relying on Janetis v. Christensen, 200 Ill. App. 3d 581 (1990),

plaintiff responds that the statute of limitations period in a

Survival Act claim is triggered on the date that the decedent

discovers the injury. We agree.

     The Survival Act does not create a statutory cause of action.

It merely allows a representative of the decedent to maintain those

statutory or common law actions which had already accrued to the

decedent before he died. Wyness v. Armstrong World Industries,

Inc., 131 Ill. 2d 403, 410-11 (1989); National Bank v. Norfolk &

Western Ry. Co., 73 Ill. 2d 160 (1978). As such, a Survival Act

claim is a derivative action based on injury to the decedent, but

brought by the representative of a deceased's estate in that

capacity. Hence, for purposes of triggering the statutory

limitations period, it is the date the deceased learns of his

injury which is controlling. See Janetis, 200 Ill. App. 3d 581; see

also Nolan v. Johns-Manville Asbestos, 85 Ill. 2d 161 (1981)

(discussing deceased's knowledge of injury as triggering

limitations period in cause that became survival claim during

appeal).

     UBS attempts to distinguish Janetis by arguing that the

procedural posture there necessitated no consideration of the

effect of the plaintiff's knowledge. UBS's argument implies that,

but for the fact that the plaintiff's amended complaint related

back to the deceased's previously filed personal injury suit, a

plaintiff representative's knowledge of injury might be considered

controlling. We are not convinced.

     Regardless of whether the deceased had brought a preceding

personal injury action, to which a resulting Survival Act claim

relates back, a survival claim remains a derivative action advanced

by a nominal plaintiff in a representative rather than a personal

capacity. The actual plaintiff in such derivative action is the

deceased, and it is that person's knowledge of injury which

triggers the limitations period. The statement in Janetis that the

discovery of injury by the decedent triggers the limitations period

in a Survival Act claim is simply not a rule confined to the

procedural facts of that case.

     In this case, the deceased learned several days after May 27,

1987, that he had previously contracted AIDS. The plaintiff

representative filed the Survival Act claim less than two years

later, fully within the statute of limitations period. We disagree

with UBS that the purposes served by application of the discovery

rule are not advanced here. See Rozny v. Marnul, 43 Ill. 2d 54, 70

(1969). While the discovery rule does not apply to every case, the

passage of time in this case did little, if anything, to increase

any problems of proof. Thus, any problems of proof do not compare

to the hardship to the deceased, who did not know of his right to

sue. Cf. Nolan, 85 Ill. 2d 161.

     We therefore find that plaintiff's Survival Act claim was not

barred by the two-year statute of limitations and hold that UBS

would not be entitled to judgment on this issue.

                                CONCLUSION

     We hold that section 3 of the Blood Shield Act requires that

the allegedly negligent conduct of UBS be measured against the

standard of care applied to professional conduct. The trial court

erred as a matter of law in allowing judgment of UBS's conduct

against a reasonable blood bank standard of care. We therefore

reverse the judgments of the appellate and trial courts and remand

this cause to the trial court for retrial.

Appellate court reversed;

                                                  circuit court reversed;

                                                          cause remanded.

                                                                         

     JUSTICE NICKELS, specially concurring:

     I agree that compliance with professional rules or industry

standards is evidence of the standard of care, but not conclusive

of it. I further agree that plaintiff's survival action is timely

because it was brought within two years of the decedent's discovery

that the injury was wrongfully caused. However, I disagree with the

majority's analysis and conclusion concerning the standard of care

articulated in the Blood and Organ Transaction Liability Act (the

Act) (Ill. Rev. Stat. 1983, ch. 111½, par. 5101 et seq.).

Therefore, I cannot join in the opinion of the majority.

     Section 3 of the Act, entitled "Imposition of Liability,"

provides:

               "Every person, firm or corporation involved in the

          rendition of any of the services described in Section 2

          warrants to the person, firm or corporation receiving the

          service and to the ultimate recipient that he has

          exercised due care and followed professional standards of

          care in providing the service according to the current

          state of the medical arts ***." (Emphasis added.) Ill.

          Rev. Stat. 1983, ch. 111½, par. 5103.

After a labored exercise in etymology, the majority concludes that

the Act requires a blood bank's conduct be measured against a

professional standard of care. Faced with the statutory language

imposing a due care standard, the majority adroitly reasons that "a

blood bank's conduct is to be measured against `professional

standards of care' while the bank is bound to exercise care which

is due." (Emphasis in original.) Slip op. at 18. Quite simply, this

strained interpretation is supported neither by traditional common

law principles nor by the language contained in the Act.

     The majority's reading of the Act squeezes all potential

liability into a cause of action based on the negligent rendition

of medical services by a physician. However, the Act plainly

applies to "every person, firm or corporation" involved in blood

banking activities. The Act therefore imposes a warranty not only

on blood bank physicians, but also on the corporation itself and

every other employee. As the corporation itself and many of its

employees are not physicians, their conduct may not be judged by a

professional standard of care.

     The Act by its terms imposes two warranties on those involved

in providing blood banking services. First, the Act imposes a

warranty of "due care." Second, the Act imposes a warranty that

"professional standards of care" were followed in the rendition of

the blood banking services. I submit that the reason that the Act

imposes these two warranties is to simply require "due care" by

those who are not physicians and a "professional standard of care"

by those who are physicians. For example, if plaintiff's theory is

that the manager of the firm or corporation engaged in blood

banking activities hired unqualified personnel or inadequately

trains or supervises them, there is no medical judgment involved

and the due care standard articulated in the Act logically applies.

Similarly, if a plaintiff's theory is that an employee not under

the control of a physician improperly stores, labels, or transports

the blood products, the due care standard articulated in the Act

also logically applies because liability is not premised on a

theory of medical malpractice by a physician. In contrast, if a

plaintiff's theory is that the physician in charge of the technical

and scientific operation of the blood bank made a negligent medical

decision, then the professional standard of care applies. Of

course, a blood bank may then be held liable on theory of vicarious

liability for the negligent acts of its employees.

     Such an interpretation is consistent with traditional common

law principles applicable to physicians and hospitals. At common

law, a hospital may be held liable for the failure to exercise due

care. In such cases liability is not predicated on medical

judgments, but on the hospital's failure to exercise due care in

the selection of staff (Dayan v. Wood River Township Hospital, 18

Ill. App. 2d 263, 268 (1958); Northern Trust Co. v. Louis A. Weiss

Memorial Hospital, 143 Ill. App. 3d 479, 486 (1986)); or failure to

exercise due care in the administration of its rules and

regulations (Johnson v. St. Bernard Hospital, 79 Ill. App. 3d 709,

718 (1979)); or failure to exercise due care in its managerial

responsibilities to review and supervise treatment (Darling v.

Charleston Community Memorial Hospital, 33 Ill. 2d 326 (1965)). In

contrast, a physician's conduct is judged based on a professional

standard of care. Purtill v. Hess, 111 Ill. 2d 229, 241-42 (1986).

The Act is consistent with these common law principles in

articulating both a professional standard of care and an ordinary

due care standard.

     The majority justifies its rejection of these common law

principles because of the need to protect medical judgments. Slip

op. at 23. However, the protection of these medical judgments is

clearly accomplished by imposing a professional standard of care in

those cases where plaintiff's theory involves professional

negligence by a physician. However, I can discern no reason why a

business person who runs a blood bank should be judged by a

professional standard of care in a case involving negligent

supervision or administration of blood banking services.

Furthermore, where an employee of the blood bank mistakenly labels

or stores blood, what medical judgments are sought to be protected?

As these defendants are not physicians, there is no reason to apply

a professional standard of care to their actions.

     The majority also claims that "the term `due care' cannot be

construed to indicate a reasonableness standard of care without

creating surplusage within section 3." Slip op. at 18. The majority

reasons that "[i]f the legislature intended that merely a

reasonableness standard of care apply, there was no need to include

the term `followed professional standards of care.' " Slip op. at

18. However, it is the majority's selective reading of the statute

that creates surplusage. If the legislature had intended that only

a professional standard of care apply, then it need not mention due

care at all. A far more reasonable reading of the statute is that

it imposes two warranties, a professional standard of care for

liability based on a physician's conduct and a due care standard

for those who are not physicians.

     The majority reasons that the legislature must have intended

to change the common law because the legislature did not merely end

the application of principles of strict products liability to blood

in section 2, but went on to impose a particular form of statutory

liability in section 3. According to the majority, if the purpose

of the Act was to end application of strict liability while leaving

traditional negligence principles intact, then "there was no need

for the legislature to go beyond section 2 in crafting a specific

statutory liability for blood service providers; existing common

law negligence standards of care would have sufficed." Slip op. at

14.

     The majority fails to recognize that section 3 changed the

common law in two important ways. First, unlike an action for

products liability where privity is not required, common law

actions for medical malpractice generally require a physician-

patient relationship in order to impose liability. Kirk v. Michael

Reese Hospital & Medical Center, 117 Ill. 2d 507, 531 (1987) ("a

plaintiff cannot maintain a medical malpractice action absent a

direct physician-patient relationship between the doctor and

plaintiff or a special relationship"). Thus, one purpose of the

express warranty contained in section 3 was to prevent any argument

that a blood bank physician had no professional duty to an ultimate

recipient of blood products.

     The second reason for the inclusion of section 3 is that the

existing common law standard of care for physicians was changed by

the inclusion of the language "in providing service according to

the current state of the medical arts." This language is an

explicit rejection of the common law "locality rule" that

traditionally governs the standard of care for physicians in

medical malpractice actions. The locality rule "requires a

physician to possess and to apply that degree of knowledge, skill,

and care which a reasonably well-qualified physician in the same or

similar community would bring to a similar case under similar

circumstances." (Emphasis added.) Purtill, 111 Ill. 2d at 242. In

recognition of the national scope of blood banking and the need for

the utmost care to insure the safety of the blood supply, the Act

rejects the locality rule and instead requires a blood bank

physician to practice in accordance with the state of the art. For

this reason, an expert testifying to the professional standard of

care for a physician involved in blood banking must have knowledge

of the state of the art, not merely what is the standard for the

geographic area in which the defendant physician practices.

     Although I disagree with the majority's analysis and

conclusion concerning the standard of care articulated in the Act,

I agree with the judgment. The trial court instructed the jury that

the defendant blood bank had a duty to use "due care" and further

defined "due care" as that degree of care "that would be used by

reasonably careful blood banks under circumstances similar to those

shown by the evidence." Cf. Illinois Pattern Jury Instructions,

Civil, No. 105.03.01 (3d ed. 1990). Such an instruction is

appropriate where plaintiff's theory is based on a defendant blood

bank's institutional negligence. However, the jury was further

instructed that in making this determination it could consider "the

knowledge and methods available at and prior to February 1984 to

educate and screen donors and test blood" and "the practices and

procedures of the blood banking industry for screening donors and

testing blood." The appropriate manner of screening of donors and

testing blood is a medical decision made by the physician who is

the medical director of a blood bank. See 210 ILCS 25/2--125, 7--

108(a) (West 1994). Thus, the trial court was in error in applying

an ordinary due care standard to a theory of professional

negligence. Furthermore, appropriate expert testimony was required

in order to inform the jury concerning the current state of the

medical art of blood banking at the time in question in order to

establish the standard of care. For these reasons, I concur in the

judgment only.

     JUSTICE MILLER, dissenting:

     I do not agree with the majority's interpretation of the

statute, or with its determination that the plaintiff is entitled

to another trial. In my view, the evidence in this case compels the

conclusion that the defendant complied with the applicable standard

of care. For these reasons, I respectfully dissent.

     Section 3 of the Blood and Organ Transaction Liability Act

provides:

               "Every person, firm or corporation involved in the

          rendition of [blood] services *** warrants to the person,

          firm or corporation receiving the service and to the

          ultimate recipient that he has exercised due care and

          followed professional standards of care in providing the

          service according to the current state of the medical

          arts ***." 745 ILCS 40/3 (West 1994).

     The Act was passed in response to this court's decision in

Cunningham v. MacNeal Memorial Hospital, 47 Ill. 2d 443 (1970),

which had held that whole blood is a product for purposes of strict

liability. Section 2 of the Act states that the furnishing of blood

for transfusions is a service rather than a sale. Section 3 of the

Act, quoted above, provides the applicable standard of care that

blood banks must meet in rendering this service. Clearly, the aim

of the legislature was to impose a professional standard of care in

these circumstances, and I would interpret the provision to

effectuate that intent. The purpose of the Act would be defeated if

something other than professional standards were to govern, and I

agree with the defendant that no liability can exist under the Act

if professional standards are complied with.

     The majority opinion fails to reconcile the statutory language

and in the end adopts an interpretation that is internally

inconsistent. Along the way, the majority engages in what can only

be characterized as a lengthy, confusing, and unnecessary analysis

of common law negligence. At one point, the majority declares that

the common law "is not contravened by construing section 3 to

require application of a professional standard of care to blood

banks" (slip op. at 25), as if common law requirements were

relevant to this inquiry. The statute, however, was expressly

designed to alter the law in this area by providing a statutory

definition of a blood bank's duties; after all, the statute was

originally written to overrule the holding in Cunningham that blood

is a product for purposes of strict tort liability. The legislature

certainly contravened that common law development.

     The majority's eventual resolution of the case is unclear,

given the conflicting statements in the opinion regarding the

meaning of the statutory language. Despite a lengthy discussion

that seems to suggest that a blood bank's conduct will be measured

solely against a professional standard of care, the court concludes

that "Section 3 simply does not indicate, nor does Illinois common

law agree, that conforming to professional standards of care in all

instances equates with due care" (slip op. at 30), leaving open the

possibility that a lay standard might govern.

     I believe that the statute plainly requires the use of a

professional standard of care. Applying a vague, undefined "due

care" standard, not anchored to professional practices, leaves a

defendant subject to potentially conflicting requirements, as this

case demonstrates. Here, the jury was permitted to assess the

defendant's conduct against not only the prevailing practices of

blood banks in February 1994, when the blood at issue here was

donated, but also against a lay standard of what blood banks, in

hindsight, could have been doing to halt the spread of AIDS.

     This attempt to combine professional and lay standards is

ultimately unworkable. Asking the jury to consider both

professional and lay standards means that compliance with lay

standards might be necessary even if the defendant's conduct, as

measured against professional standards, is not wanting. Here, the

defendant presented evidence that professional standards did not

call for surrogate testing in February 1984; the plaintiff's

witnesses, however, believed that surrogate testing should have

been used. If professional and lay standards impose inconsistent

requirements, then a provider of services under the Act might be

liable under one standard or another, no matter what it does, in

plain contravention of the purpose of the statute.

     As a final matter, I do not believe that invocation of a lay

standard of care is justified in this case on the grounds,

expressed in the majority opinion, that the standards of an entire

profession might lag behind developments in society at large.

Leaving aside for the moment the question whether use of a

nonprofessional standard, even for that corrective purpose, is

consistent with the terms of the Act, I find no evidence here that

the practices of the blood banking profession were outmoded in

February 1984. Of course, the statutory requirement that a provider

of services under the Act exercise due care and follow professional

standards of care "according to the current state of the medical

arts" is broad enough to ensure that those who engage in the blood

banking profession will not lag behind the medical arts.

     The legislature intended for a professional standard of care

to apply in this area. I would therefore interpret the language at

issue here to mean that a blood bank must exercise a degree of care

that is consistent with prevailing professional standards. Thus, a

blood bank's conduct will be measured against professional

standards only, rather than the mixture of professional and lay

standards proposed by the plaintiff and the courts below, and

seemingly allowed by the majority opinion.

     Under the record in this case, it seems clear that the

defendant is entitled to summary judgment. The evidence indicates

that the defendant was in compliance with all professional

standards at the time relevant here. Although the plaintiff

presented testimony suggesting that the defendant should have used

surrogate testing, or other means, to screen its blood donations,

virtually no blood bank in the nation was using those procedures at

that time. Given this evidence, I would reverse the judgment

entered in favor of the plaintiff and remand the action so that

judgment may be entered in favor of the defendant.

     JUSTICE HARRISON, also dissenting:

     Finding ambiguity where none exists, the majority engages in

an exhaustive discussion that is as unnecessary as it its

confusing. Section 3 of the Blood and Organ Transaction Liability

Act (Ill. Rev. Stat. 1983, ch. 111½, par. 5103) requires blood

banks to "exercise[ ] due care and follow[ ] professional standards

of care." There is no reason to believe that this language means

anything other than what it plainly says. Under the statute,

compliance with professional standards of care is not sufficient.

One must also exercise due care. The law could not be more

straightforward.

     Although the majority initially appears to reject this

interpretation, it ultimately concedes that due care and compliance

with professional standards are both required by the statute. The

majority correctly notes that conformance with professional

standards of care is indicative but not conclusive of due care.

Slip op. at 29. Even if professional standards have been met, a

blood bank may still be liable if the standards themselves are

deficient. That is precisely what the appellate court here held

(274 Ill. App. 3d at 581-83), and it was the basis for the

instructions given to the jury by the circuit court.

     Why the majority nevertheless decides to reverse the lower

courts' judgments I cannot understand. The majority is obviously

concerned that in applying the due care prong of the standard,

juries should not judge blood banks according to some generalized

lay standard of due care. As the appellate court pointed out,

however, the trial court here avoided that error when it

specifically instructed the jury that UBS was required to act in

accordance with how a reasonably prudent blood bank would have

conducted itself. 274 Ill. App. 3d at 583-84. Thus, contrary to

what the majority states, the jury was never told it was free to

disregard the expert testimony "and/or decide the reasonableness of

UBS's conduct based on the jury's own knowledge as well." Slip op.

at 30.

     Formulating jury instructions for this case posed some obvious

challenges. The criticism has been made that the appellate court's

instructions made compliance with professional standards

subordinate to the obligation to exercise due care, but if

compliance with professional standards is merely indicative and not

conclusive of due care, as the majority holds (slip op. at 29), I

fail to see how else the instructions could have been drafted. The

criteria for assessing jury instructions on review is simply

whether, considered as a whole, they were clear enough that they

did not mislead the jury and they fairly and accurately stated the

applicable law. See Dabros v. Wang, 243 Ill. App. 3d 259, 267

(1993). The instructions here satisfied these criteria. I would

therefore affirm.